**In re KRISTEN B.**

No. 88–223–Appeal.

Supreme Court of Rhode Island.

April 27, 1989.

Francis B. Brown, CASA, Laureen Quaranto D'Ambra, Janet Gilligan, Department of Children and their Families, Shella Katz, guardian ad litem, for plaintiff.

Joseph A. Palmieri, Palmieri & Carr, Barbara Hurst, Asst. Public Defender, Providence, for defendant.

## OPINION

FAY, Chief Justice.

This matter is before the court on an appeal from a decree of the Family Court granting a petition to terminate parental rights filed by the Department of Children and Their Families (DCF). The petitioners, Catherine B. and Peter H.,[1] at that time had three minor children; however, their parental rights were terminated only in regard to their eldest child, Kristen. We affirm the decision of the trial justice. The facts to this case are as follows.

In July 1985 Catherine B. voluntarily placed her three-year-old daughter, Kristen, in the care of DCF, stating that through no fault of her own she was unable to care for or control her because of her aggressive behavior toward the other children in the family. During her first few weeks of foster care Kristen began alleging she had been sexually abused by her parents, whom she consistently referred to as the "bad people."

In mid August 1985 Catherine informed DCF that she did not want visitation with Kristen "for awhile." The following month the Family Court issued an ex parte order of detention placing Kristen and her two younger sisters in the temporary custody of DCF, relying on the child's allegations of sexual abuse by the parents. During September and October 1985 Kristen visited twice with her two siblings; however, she adamantly refused visitation with her parents.

On October 25, 1985, the two younger children were returned to Catherine while foster care was continued for Kristen, and parental visitation was suspended.

In November 1985 DCF caseworker Sandra Messier established a case plan for both Catherine and Peter to follow in order to have visitation with Kristen. This case plan essentially focused on therapy for both Kristen and her parents, incorporating a variety of rehabilitative services such as Parents Anonymous, the East Side Center, and the Family Center in Pawtucket, all geared toward developing better parenting skills. In addition the case plan called for alcohol and drug counseling for both parents. Ultimately both Catherine and Peter (on the advice of counsel) refused to sign this case plan.

A commitment trial was held in January 1986. At the conclusion of the trial, the parents and DCF entered into a consent decree establishing a finding of dependency, wherein Kristen was committed to the care, custody, and control of DCF until further order of the court. Psychological evaluations were ordered for both Kristen and her parents, and the recommendations in those evaluations were to be incorporated into a case plan for reunification.

Doctor Judith Kaliski, a clinical psychologist, evaluated both the parents and the child in the spring of 1986. Her professional opinion was that Kristen suffered from a "hyperactive behavioral disorder of childhood" and that she was a sexual-abuse victim in the process of developing a severe behavioral disorder. Doctor Kaliski found Peter to be a chronic alcoholic with a severe personality disorder and Catherine to suffer from a personality disorder of the "passive-aggressive" type. Doctor Kaliski's recommendations focused on intensive therapy and the utilization of such social services as Alcoholics Anonymous for Peter, Parents United (group therapy for sexual-abuse victims and parents who sexually abuse children) for Kristen and her parents, and individual counseling for both parents and the child before any reunification of the family would be possible.

In June 1986 Sandra Messier of DCF presented a case plan for reunification that contained Dr. Kaliski's recommendations for intensive therapy. On July 2, 1986, the plan was approved by the Family Court and executed by both the parents and DCF as a condition of reinstatement of visitation with Kristen. Pursuant to Dr. Kaliski's recommendation, the Family Court sus-

---

1. These are not their real names. At the time of the child's voluntary placement the parents were unmarried and living together. Subsequently they were married and they are now separated. Each parent filed a separate brief within this appeal. For the sake of clarity we shall refer to the appealed issues as representing the interests of both parents.

pended all parental visitation for six months while the family underwent counseling.

In accordance with the July 1986 case plan, DCF transported both parents to Parents United meetings in Brockton, Massachusetts, throughout July and August 1986. Unfortunately not only was their attendance at those meetings sporadic at best but, when they did attend their antagonistic attitude toward the entire group was actually counterproductive. Mary Devlin, an expert in sexual abuse and the leader of the Parents United program in Brockton, testified that given their attitudes, "the family was not workable."

On October 1, 1986, the Family Court reviewed the situation and ordered a second evaluation of Kristen to determine whether at that time she could emotionally handle a visit with her parents. Doctor Frank Jones, a licensed psychiatrist and an expert in sexual abuse, evaluated Kristen on three different occasions throughout October of that year. We find it unnecessary to repeat the rather graphic details of Dr. Jones's testimony, which focused on the specific acts of sexual contact between the parents and the child. Doctor Jones's evaluation of Kristen was based upon play therapy with anatomically correct dolls, and as a result he found that there definitely had been sexual abuse by one or both parents. Doctor Jones reported that Kristen was not ready to accept visitation with her parents and that at least another six months to a year of therapy would be necessary to prepare her for any type of visitation. Although Dr. Jones did not file his report until October 26, 1986, Catherine informed the DCF caseworker two weeks prior to the filing of his report that she was no longer interested in any contact with DCF or any type of counseling. Sandra Messier immediately informed both parents that this was a counterproductive step and that if they did not continue with the court ordered case plan, DCF would file suit to terminate their parental rights.

In November 1986 Rosemary Provencher, a social worker for DCF, became involved in this matter. Ms. Provencher testified that between November 1986 and March 1987 she visited Catherine's home on at least six different occasions. She stated that each visit varied in regard to the time of day, and although people were apparently inside the apartment, she consistently received no response. She also testified that she attempted to effectuate a voluntary termination of parental rights with the parents, as she was informed through their attorneys that this was their desire. In December 1986 when Ms. Provencher was informed that Catherine and Peter no longer desired voluntary termination of parental rights, she developed a new case plan and mailed it to both parents. This new plan was essentially the same as the previous one, with which the parents had not complied. Once again she received no response to her inquiries or correspondence.

In March 1987, after six months of no communication from either Catherine or Peter, DCF filed a petition to terminate parental rights pursuant to G.L.1956 (1981 Reenactment) § 15-7-7(c), as amended by P.L.1984, ch. 204, § 3. At the conclusion of a trial in November 1987 the petition was granted by a Family Court justice. The parents appeal to this court from that decree.

The petitioners raise numerous issues within their appeal. We shall address each issue in the order in which it was raised.

■ The parents first argue that the trial justice, in his decision to terminate parental rights, clearly misconceived or overlooked material evidence when he found that their conduct or conditions were not likely to change. We disagree. After reviewing the record in this case, we find that the trial justice did not misconceive the evidence when he held that Catherine and Peter were not willing to work toward a change in the family conditions that led to the placement of their child with DCF. Such a finding is prescribed by the controlling statute.[2]

2. General Laws 1956 (1981 Reenactment) § 15-7-7, as amended by P.L.1984, ch. 204, § 3,

This court has previously stated that the termination of parental rights involves a balancing of interests, those of the state, the child, and the natural parents. *In re Kristina L.*, 520 A.2d 574, 579 (R.I. 1987); *In re Kenneth*, 439 A.2d 1366, 1369 (R.I.1982). Although termination of parental rights by its very nature pits the interest of the state against that of the parents, the court should not presume the child and his parents are adversaries. *See Santosky v. Kramer*, 455 U.S. 745, 759–60, 102 S.Ct. 1388, 1398, 71 L.Ed.2d 599, 611 (1982). All rights to the custody, care, and nurturing of a child first reside with the parents, and "until the State proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of their natural relationship." *Santosky*, 455 U.S. at 760, 102 S.Ct. at 1398, 71 L.Ed.2d at 611. We have previously held that § 15–7–7(c) mandates that unless the child "is likely to suffer physical and/or emotional harm, there is no reason to disturb the basic security of a family relationship." *In re Lester*, 417 A.2d 877, 880 (R.I.1980) (quoting *In re Jonathan*, 415 A.2d 1036, 1039 (R.I.1980)). Therefore, the primary step before any termination of parental rights is that there be a finding of parental unfitness. Once this fact is established, the best interests of the child outweigh all other considerations. *In re Kristina L.*, 520 A.2d at 580. This court previously has stated that the statute requires that a trial justice, when considering a petition to terminate parental rights, examine the conduct of the parents or the custodians in conjunction with that of the authorized agency. *In re Armand*, 433 A.2d 957, 961 (R.I.1981). Before any termination the agency must prove by clear and convincing evidence that regardless of the parents' behavior, it made efforts to encourage and strengthen the parental relationship. *In re Kathaleen*, 460 A.2d 12, 14 (R.I.1983); *In re Kenneth*, 439 A.2d at 1369; *In re Armand*, 433 A.2d 957 (R.I. 1981); *In re LaFreniere*, 420 A.2d 82 (R.I. 1980). The plaintiffs contend that these efforts at reunification were not of the "reasonable" nature enunciated by this court in *In re William, Susan, and Joseph*, 448 A.2d 1250 (R.I.1982). Although we agree that reasonable efforts at reunification must always be made by DCF before there is a termination of parental rights, we have stated that such a subjective term must be defined by the particular facts and circumstances of each case. *In re Ann Marie*, 461 A.2d 394, 395 (R.I.1983); *In re William, Susan, and Joseph*, 448 A.2d at 1255. In this case the facts fully establish that DCF made more than reasonable efforts to reunite this family. The caseworker constantly emphasized the importance of therapy, and when Peter expressed his discontent with a particular counselor, DCF offered to replace that counselor at its expense. Moreover DCF always assumed responsibility for driving both parents to

---

states in pertinent part:

"Termination of parental rights.—The court shall, upon a petition duly filed after notice to the parent and hearing thereon, terminate any and all legal rights of the parent to the child, including the right to notice of any subsequent adoption proceedings involving the child if the court finds as a fact that:

\* \* \* \* \* \*

(c) The parent has or has had a child in the care of a licensed or governmental child placement agency, either voluntarily or involuntarily, for a period of at least six (6) consecutive months and the court further finds that the integration of the child into the home of the parent is improbable in the foreseeable future due to conduct or conditions not likely to change. The court shall review the initial conduct or conditions which caused the child to come into the care of the licensed or governmental child placement agency and determine whether there has been a change in the circumstances of the parent. In determining such conduct or conditions the court shall consider the lack of a good faith effort of the parent over a continuous period of six (6) months after placement to adjust his or her circumstances, conduct or conditions to make the return of the child possible or the failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such an extended duration of time that it appears reasonable that no lasting adjustment can be affected.

\* \* \* \* \* \*

In considering the termination of rights as aforesaid, the court shall give primary consideration to the physical, psychological, mental and intellectual needs of the child insofar as that consideration is not inconsistent with other provisions of this chapter. The standard of proof shall be by clear and convincing evidence."

Brockton, Massachusetts, for Parents United meetings. When Catherine gave birth to her fourth child, DCF offered to provide child care while she attended counseling. This court does not expect the impossible from the various agencies that deal with child protection and placement. *In re Ann Marie*, 461 A.2d at 395. Nor shall we burden the agency with the additional responsibility of holding the hand of a recalcitrant parent.

Section 15-7-7 imposes two requirements on a parent whose child is in the care of an authorized agency: (1) to maintain contact with the child and (2) to plan for the child's future. The petitioners in this action assert that although they attempted to maintain contact with Kristen, DCF constantly refused them visitation. The record indicates otherwise. The suspensions of visitation were always court ordered and not discretionary with DCF. Furthermore, the trial justice did not base his decision to terminate their parental rights upon the parents' lack of contact with their daughter but rather upon their failure to plan for her future. This requirement is statutorily imposed so that the parents are aware of the temporary nature of the child's placement with the agency. *In re Armand*, 433 A.2d at 961. When planning for reunification with a child, the parent not only should establish and comply with a plan that can provide a sound and constructive family life but must also perform some minimal act toward the fulfillment of that plan. *Id.* In the instant case any plan for reunification necessitated attendance and cooperation by both parents at all Parents United meetings. Obviously, this is a very minor obstacle to overcome when a parent is attempting reunification with a child. This hurdle cannot be circumvented by alleging discouragement or displeasure with the entire situation.

Although Catherine admitted that she believed her daughter had been sexually abused, she refused to continue attending Parents United meetings. She justified her actions by stating that she had never sexually abused her daughter and that she did not fit in with "those people." Evidently the trial justice viewed these actions in a different light. The testimony at trial incontrovertibly established that Kristen had been sexually abused. Catherine acknowledged this fact and also disclosed that she too had been sexually abused as a child. Group encounters such as Parents United are designed to assist not only sexual abusers but sexual-abuse victims and their families as well. Catherine and Peter were both informed that there was a sexual-abuse problem involving their daughter and that Parents United was the only effective type of therapy that would afford them an understanding of the psychological and emotional trauma created by such abuse. Both Dr. Kaliski and Dr. Jones testified that this family needed intensive sexual-abuse therapy of this type before any reunification would be possible. Catherine and Peter knew that their attendance at Parents United was the primary foundation for the rebuilding of their family and that the case plan that they had signed required diligent attendance. Despite these facts they stopped attending meetings. We note that Catherine was at that time in the final months of pregnancy with her fourth child, and thus her lack of attendance may have been excusable; however, both parents' constant denial of any sexual-abuse problem and their uncooperative attitudes within the group sessions cannot be excused. Their lack of cooperation is particularly indefensible in light of the fact that each parent knew this therapy was the only avenue available to achieve reunification. Clearly the trial justice did not misconceive the evidence when he found that this half-hearted attitude toward the court-ordered therapy equated with conduct or conditions that were not likely to change at present or in the foreseeable future, despite reasonable efforts by DCF.

We have previously held that the findings of a trial justice sitting without a jury are entitled to great weight and will not be disturbed unless they are clearly wrong or the trial justice misconceived or overlooked material evidence. *In re Armand*, 433 A.2d at 962; *In re LaFreniere*, 420 A.2d at 84; *Milliken v. Milliken*, 120 R.I. 762, 764,

390 A.2d 934, 935 (1978). Additionally, we have stated that this court shall examine the record to determine whether there is legally competent evidence to support the trial justice's finding. *In re Crystal A.,* 476 A.2d 1030, 1033 (R.I.1984); *In re Kenneth,* 439 A.2d at 1369. After a thorough review of the record in this matter we find that the trial justice had no alternative but to hold that the parents' conduct and the conditions at home were not likely to change. The record in this matter is replete with instances of DCF encouragement to both Catherine and Peter to participate in sexual-abuse therapy and to work toward reunification with their daughter. Clearly this case is distinguishable from both *In re LaFreniere* and *In re Kristina L.* where this court held that the agency did not do enough to encourage the parent-child relationship. As we previously stated, we do not expect the impossible from these agencies, particularly as in a case like this one in which the parents have given up on their child.

The parents also contend that the trial justice erred when he admitted the hearsay statements made by Kristen regarding sexual abuse. They allege error on two grounds: first, that the child's competency was never established and, second, that her extrajudicial statements to Sandra Messier were not admissible under any recognized exception to the hearsay rule and otherwise lacked any special indicia of reliability. We disagree.

 As far as the issue of Kristen's competency as a witness is concerned, we have previously held that the statute G.L. 1956 (1981 Reenactment) § 14-1-69, as enacted by P.L.1985, ch. 381, § 1, "does not require that the child be found competent before his statement can be admitted into evidence." *In re Thomas V.,* 540 A.2d 1027, 1027 (R.I.1988); *see State v. Nordstrom,* 104 R.I. 471, 475, 244 A.2d 837, 839-40 (1968).

This court has addressed the hearsay-exception issue in *In re Thomas V.* In that case we held that when such a hearsay statement is made spontaneously, within a reasonable time after the act is alleged to have occurred, and was made to someone the child would normally turn to for sympathy, protection or advice, that statement is within the realm of § 14-1-69. 540 A.2d at 1027. In the case at bar the testimony clearly established that Kristen grew to trust Sandra Messier. Because of Kristen's constant fear that her mother would do "bad things" to her, she often insisted that Sandra accompany her on any parental visitation. We can only find that these types of statements to someone such as a social worker with whom she had developed a trusting relationship are well within the guidelines set forth within the controlling statute.

The parents' appeal is accordingly denied and dismissed. The decree of the Family Court granting the termination of parental rights is hereby affirmed, and the papers in this case are remanded to the Family Court.