**In re ANTONIO G.**

**No. 94–111–Appeal.**

Supreme Court of Rhode Island.

May 3, 1995.

Frank P. Iacono, Jr. (CASA), Anthony J. Angeli, Jr. (DCYF), Laurel C. Ferrelli (CASA), Kevin Aucoin (DCYF), for plaintiff.

Richard Casparian, Public Defender, Janice Weisfeld, Paula Rosen, Asst. Public Defenders, Leo Manfred, Westerly, for defendant.

## OPINION

LEDERBERG, Justice.

This case came before the Supreme Court on the appeal of Mildred G. from an order of the Family Court granting the petition of the Department of Children, Youth and Families to terminate any and all legal rights of Mildred G. to her son Antonio G. For the reasons stated below, we affirm the order of the Family Court. The facts pertinent to the appeal are as follows.

### Facts and Procedural History

This case began seven years ago with the death of eighteen-month-old Jonathan G. (Jonathan). His aunt, Mildred G. (Mildred), brought the boy from New York to Rhode Island to live with her and her son Antonio G. (Antonio), then approximately nine months old. Marco Morales (Morales), the father of Antonio, came to visit Mildred in March 1988. On March 16, 1988, Mildred left Antonio and Jonathan with Morales while she went shopping. When she returned home, she found the police there. Jonathan had died as a result of multiple episodes of blunt trauma to his head. An autopsy revealed past bruises that were not the result of the same abuse that killed him.[1]

On March 17, 1988, Antonio was placed under the temporary custody of the Rhode Island Department for Children and Their Families (DCF).[2] Phillip Keefe (Keefe), an assessment social worker, immediately began working with Mildred and drew up a case plan dated April 28, 1988, which permitted weekly supervised visits with Antonio and directed that Mildred attend parenting classes and counseling sessions and undergo a parent/child evaluation. Mildred attended the weekly supervised visits but was repeatedly late. On June 20, 1988, after a hearing in Family Court, the trial justice found that Antonio had been neglected and abused by both parents and committed Antonio to the care, custody, and control of DCF until further order of the court. The trial justice also ordered DCF to submit a case plan within thirty days and ordered Mildred to complete parenting and counseling programs. On July 28, 1988, the April 28 case plan was made an order of the Family Court and Antonio continued living in foster care.

Between August 1988 and January 1989, Mildred participated in various social service programs arranged by DCF. A clinical social worker testified that Mildred related her family's use of drugs, her mother's recent death from AIDS, and her own abuse by either her father or her stepfather. Mildred maintained regular visitations with Antonio only with great difficulty. On more than one occasion, Mildred told Dorothy Fay (Fay), a

---

1. On September 14, 1989, Morales entered a plea of nolo contendere to the charge of manslaughter and was sentenced to lengthy incarceration. Morales's parental rights were terminated because his long prison sentence rendered it improbable that he could care for the child for an extended period of time. *See* G.L.1956 (1988 Reenactment) § 15–7–7(1)(b)(i). Morales is separately petitioning this court for relief from the Family Court's termination of his parental rights.

2. The name of DCF was legislatively changed to Department of Children, Youth and Families (DCYF) effective June 18, 1991.

direct-service social worker with DCF, that she desired to return to New York to live with her family. Even though Mildred was informed that moving back to New York would make reunification more difficult, on January 5, 1989, Mildred telephoned Fay from New York.

Several days later, when Mildred made clear her intent to stay in New York, Fay initiated the Interstate Compact on the Placement of Children and requested a home study of the relatives' home and the suitability of the proposed caretaker. *See* G.L.1956 (1990 Reenactment) § 40-15-1. A reply from New York was not received until one year later, when Fay learned that the relatives' home had not been approved for foster placement.

Mildred lived in New York from January 1989 to May 1990. Various case plans were developed during this time, including a weekly visitation schedule, which Mildred inconsistently followed. Mildred also participated in a New York agency's parenting classes and some counseling services. After Fay explained that the interstate compact required that any agency with which Mildred was involved must be approved, Mildred offered Fay the name and phone number of the agency's contact person, Lazaro Valdes (Valdes). It is remarkable that Fay did not reach Valdes until March 1990, almost one year later.

In May 1990, when Mildred returned to Rhode Island, case plan No. 5 was in effect, requirements of which were that Mildred find housing acceptable to DCF, find employment, and complete a second parenting program and further counseling. Fay did not assist with housing or employment, however, but in the late summer or early fall of 1990, she referred Mildred to the Family Service Society of Pawtucket, a social service agency, and to the Kent County Reunification Program. In May 1991, through the Reunification Program, Antonio was placed in his mother's home where Mildred lived with her infant son Justin.

In August 1991, however, Margaret Skuce (Skuce), to whom the case was transferred, received a report concerning allegations against Mildred by her neighbors. Mildred abruptly moved from her apartment, which DCYF had found satisfactory, to another, without notifying Skuce. When Skuce visited the new apartment, she observed that Mildred had moved without her furniture, her belongings, or the children's clothes and toys. At the end of August, Mildred told Skuce that she wished to return to New York and asked that Skuce forward an interstate-compact request to New York. Skuce complied but pointed out that only three months remained before completion of the Kent County Reunification Program, at which time the case would close and that in comparison, the interstate compact approval process would be very lengthy. On August 29, 1991, the court entered an order that DCYF initiate the interstate compact.

Also at the end of August 1991, Mildred informed Skuce that she was going to New York with Antonio and Justin and that she would return the following week. When Mildred failed to return, Skuce reported to the State Police on September 26, 1991, that the two children were missing. On October 7, Mildred telephoned Skuce that she intended to stay in New York. On October 10, the day after the Family Court issued a decree ordering that Antonio be returned to Rhode Island, Skuce drove to New York and brought Antonio back to Rhode Island.

On January 7, 1992, DCYF filed a petition with the Family Court for termination of rights of parents to consent to adoption (involuntary). The petition alleged that the parents had had a child in the care of a licensed or governmental child-placement agency for a period of at least six months and that the integration of the child in the parents' home was improbable in the foreseeable future because of conduct not likely to change. The DCYF amended the petition on October 16, 1992, to allege that Mildred had abandoned the child by moving to New York in August 1991 and had not seen the child since November 1991.

At the time of trial in February and March 1993, Mildred still lived in New York and had not visited Antonio since January 1992.

After the trial in Family Court, the trial justice found that Antonio had been in the

care of DCYF for a period of at least six consecutive months prior to the filing of the termination petition on January 7, 1992; that Antonio had come into the care of DCYF as a result of the neglect and abuse of both Mildred and Morales; that the most significant issues identified as barriers to reunification with Mildred included Mildred's lack of parenting skills and her need to address the death of Jonathan and her own violent and abusive childhood; that DCYF had consulted and cooperated with Mildred in developing eight case plans with goals of reunification; that DCYF provided parenting education and individual counseling; that DCYF never provided any meaningful housing assistance to Mildred, but that the lack of adequate housing was never the primary barrier to reunification; that DCYF provided visitation to Mildred on a consistent basis when she lived in Rhode Island and New York; that DCYF kept Mildred informed about Antonio's health, progress, and development; that DCYF met its statutory obligation "to provide reasonable efforts by available social service agencies to reunify Antonio with his mother"; that Mildred's moving twice to New York constituted a lack of a good-faith effort to adjust her circumstances, conduct, or conditions in order to have made the return of Antonio possible within the foreseeable future; and, last, that Mildred had failed to maintain contact with Antonio since January 1992.

Consequently, the Family Court found that DCYF had proven by clear and convincing evidence that Mildred had a child in the care of a licensed or governmental child-placement agency for a period of at least six months and the integration of the child into Mildred's home was improbable in the foreseeable future due to conduct or conditions not likely to change. The trial justice did not find, however, that Mildred had abandoned or deserted her child. The trial justice granted the petition terminating the rights of both Mildred and Morales to consent to adoption and gave DCYF the exclusive right to place Antonio for adoption.

Mildred appealed the termination pursuant to G.L.1956 (1981 Reenactment) § 14–1–52.

## The Issues on Appeal

On appeal, Mildred argued that DCYF failed to prove by clear and convincing evidence that she was unfit. She also argued that the trial justice erred in finding that DCYF made reasonable efforts to strengthen and encourage the parental relationship and in finding that the termination-of-parental-rights statute does not require out-of-home placement for a period of at least six months prior to the filing of the termination petition.

General Laws 1956 (1988 Reenactment) § 15–7–7(1)(c) [3] requires that the state prove three conditions before termination of parental rights can occur: "(1) the child has been in the care of a child-placement agency for six months; (2) reasonable efforts had been made to reunite the family; and (3) it is improbable in the foreseeable future that the child will be returned to the parents' home because of conduct or conditions that are unlikely to change." *In re Rene B.*, 544 A.2d 137, 139 (R.I.1988). Because the trial justice

---

**3.** General Laws 1956 (1988 Reenactment) § 15–7–7 provides in pertinent part:

"**Termination of parental rights.**—(1) The court shall, upon a petition duly filed after notice to the parent and hearing thereon, terminate any and all legal rights of the parent to the child, including the right to notice of any subsequent adoption proceedings involving the child if the court finds as a fact that:

\* \* \* \* \* \*

(c) The parent has or has had a child in the care of a licensed or governmental child-placement agency, either voluntarily or involuntarily, for a period of at least six (6) consecutive months and the court further finds that the integration of the child into the home of the parent is improbable in the foreseeable future due to conduct or conditions not likely to change. The court shall review the initial conduct or conditions which caused the child to come into the care of the licensed or governmental child-placement agency and shall determine whether there has been a change in the circumstances of the parent. In determining such conduct or conditions the court shall consider the lack of a good faith effort of the parent over a continuous period of six (6) months after placement to adjust his or her circumstances, conduct, or conditions to make the return of the child possible or the failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such an extended duration of time that it appears reasonable that no lasting adjustment can be affected."

found that the state had met its statutory obligations in respect to each of these three elements, he granted the petition terminating Mildred's rights to consent to the adoption of Antonio.

■ In reviewing the ruling of the Family Court, we are required to examine the record to determine whether the findings of the trial justice are supported by legal and competent evidence. *Id.* at 140. The findings of a trial justice are entitled to great weight and will not be disturbed unless the findings are clearly wrong or unless the trial justice overlooked or misconceived material evidence. *In re Kristen B.*, 558 A.2d 200, 204 (R.I.1989).

■ Natural parents have a fundamental liberty interest in the care, custody, and management of their child that does not evaporate if they are not model parents or have lost temporary custody of their child. *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394–95, 71 L.Ed.2d 599, 606 (1982). Therefore, "[a]ll rights to the custody, care, and nurturing of a child first reside with the parents." *In re Kristen B.*, 558 A.2d at 203. The parents and the child share a vital interest in preventing an erroneous termination of their relationship until the state is able to prove parental unfitness. *Id.* (quoting *Santosky*, 455 U.S. at 760, 102 S.Ct. at 1398, 71 L.Ed.2d at 611). A finding of unfitness, therefore, is "the first necessary step" before any termination of parental rights can be initiated. *In re Kristina L.*, 520 A.2d 574, 580 (R.I.1987). Following such a determination, "the best interests of the child outweigh all other considerations." *In re Kristen B.*, 558 A.2d at 203. Although this court has not precisely defined the term "unfit," it has held that § 15–7–7(1)(c) "mandates that unless the child 'is likely to suffer physical and/or emotional harm, there is no reason to disturb the basic security of a family relationship.'" *Id.* (quoting *In re Lester*, 417 A.2d 877, 880 (R.I.1980)). Thus, before the state may terminate parental rights, due process requires that the state support its allegations by at least clear and convincing evidence. *Santosky*, 455 U.S. at 747–48, 102 S.Ct. at 1391–92, 71 L.Ed.2d at 603.

■ In the instant case, we cannot say that the trial justice was clearly wrong in granting the termination petition because ample evidence existed that Mildred was an unfit parent to Antonio. In our careful review of the record, we find substantial legal and competent evidence to support the finding of the trial justice, especially concerning Mildred's failure to comply with requirements of the case plans designed to foster reunification. During the time she was required to complete the services called for in the case plans, Mildred twice fled to New York and a family environment where she was abused as a child and which was rejected by the interstate-compact agencies as a foster home for Antonio. These actions demonstrated that Mildred lacked responsible parental judgment and was unable to cope on her own with life's attendant difficulties. After her return to Rhode Island and after demonstrating considerable progress toward reunification, Mildred abruptly moved from an apartment acceptable to DCYF to another without her furniture, her belongings, or those of her children. Moreover, this migration was followed by her second abrupt move to New York, when she brought her two children with her without informing DCYF, which still maintained care, custody, and control of Antonio. The trial justice found that the second New York flight virtually negated the progress Mildred had previously made toward reunification, especially because reunification would occur three months later, at which time the case would be closed. After reviewing the record, we cannot say the trial justice's characterization of these decisions as "unfortunate" was mistaken.

Mildred also argued that the instant case was controlled by *In re Kristina L.*, 520 A.2d at 580, where this court rejected a termination petition because we found that the state had failed to prove and the trial justice did not find, that the parents were unfit. Although some similarities do exist between the two cases, one startling difference stands out: no child for whom the parents in *Kristina* were the primary caretakers was killed while under their care. The death of Jonathan and Mildred's subsequent inability to comprehend her role in that outcome by

leaving the children with Morales, as well as her refusal for years after Jonathan's murder to believe that Morales had used drugs or abused the children, make any comparison to *Kristina* untenable. Although Mildred did testify at trial that she believed Morales had killed Jonathan, her initial disbelief, combined with her inability to complete numerous case plans, demonstrated her lack of judgment and maturity. Her persistent tendency to place her own interests above those of Antonio demonstrates that she has not made good-faith efforts to adjust her circumstances, conduct, or conditions. Section 15–7–7. Consequently, we conclude that the trial justice neither misconstrued nor overlooked material evidence, nor was he clearly wrong in his conclusions.

 Mildred next alleged that the trial justice erred in finding that DCYF made reasonable efforts to strengthen and encourage the parental relationship. When considering a petition for termination of parental rights, the trial justice must examine the conduct of the parent or parents in conjunction with that of the state agency. *In re Armand,* 433 A.2d 957, 961 (R.I.1981). Before the parents' rights can be terminated, the state agency must prove by clear and convincing evidence that, regardless of the parents' behavior, it made reasonable efforts to encourage the parental relationship. *In re Kristen B.,* 558 A.2d at 203. "Reasonable efforts" is a subjective term, however, one that "must be defined by the particular facts and circumstances of each case." *Id.*

In the instant case, Mildred argued that DCYF failed to make reasonable efforts to strengthen and encourage the parental relationship in three specific ways: (1) DCYF had failed to provide her with assistance in finding adequate housing, (2) DCYF had failed to arrange services for her while she was in New York and was not diligent in pursuing the interstate compact, and finally, (3) DCYF had hampered her attempts to visit Antonio. We disagree.

 In order to comply with the reasonable-efforts requirement, the state agency must demonstrate by clear and convincing evidence that it (1) consulted and cooperated with the parent or parents in developing a plan for appropriate services to be provided to the child and his or her family, (2) made suitable arrangements for visitation, (3) provided services and other assistance to the parent or parents to ensure that problems preventing discharge from foster care would be resolved or ameliorated, and (4) informed the parent or parents about the child's health, progress, and development. *In re Nicole G.,* 577 A.2d 248, 249 (R.I.1990); *In re Armand,* 433 A.2d at 962. Cases in which homelessness is a primary factor preventing reunification require that DCYF provide housing assistance as directed by factor 3 above. *In re Nicole G.,* 577 A.2d at 249.

 Our review of the record demonstrates that DCYF arranged for Mildred's participation in classes, individual counseling, and the Kent County Reunification Program. However, DCYF provided little or no help to Mildred in finding adequate housing for herself, Justin and Antonio. Mildred argued that the trial justice erred in finding that there existed more significant problems to reunification than the barrier caused by lack of adequate housing. We are of the opinion that the trial justice was not clearly wrong on this issue.

Although DCYF did not assist her, Mildred obtained adequate housing in Central Falls while she participated in the Kent County Reunification Program. At that point, the housing barrier to reunification vanished. Mildred abandoned this housing before fleeing for a second time to New York, thus creating yet another barrier to reunification. We, therefore, conclude that the trial justice was not clearly wrong in finding that the lack of adequate housing was never the primary barrier to reunification.

 Mildred next argued that DCYF's attempt to provide services to her while she was in New York did not constitute a reasonable effort. While Mildred was in New York, DCYF did little more than initiate the interstate compact, and then wait about one year for a reply. Although this failure to pursue the interstate compact was clearly far from diligent, DCYF's initiation of the compact was reasonable, given the circumstances of the case. Mildred was warned by DCYF

that returning to New York would cause delays in reunification, and in fact, a delay of one year did result after DCYF initiated the interstate compact. Although the delay was lengthy, Fay testified that she did not provide any services to Mildred because it was the responsibility of the interstate compact to do so. The responsibilities of DCYF ended when the interstate compact was initiated.

Mildred also claimed that DCYF hampered Mildred's efforts to visit Antonio by failing to make suitable arrangements for visitation contrary to factor 2 listed above. Our review of the record shows this claim to be without merit. The visitation schedules created by DCYF were generally reasonable, and most of the problems Mildred experienced with the schedules derived either from her first sudden relocation to New York, her second pregnancy, or her general health.

The statute on termination of parental rights, *see* § 15–7–7, "imposes two requirements on a parent whose child is in the care of an authorized agency: (1) to maintain contact with the child and (2) to plan for the child's future." *In re Kristen B.*, 558 A.2d at 204. The trial justice noted:

> "Our child welfare system is far from perfect. Few would argue that the resources available to DCYF and other similar agencies are adequate to meet the various demands of dysfunctional families. Nevertheless, DCYF is statutorily required to make reasonable efforts to assist a parent to effect a lasting adjustment in his or her circumstances, conduct or conditions to make the return of the child possible. By the same token, however, a parent cannot evade total responsibility. * * *

> Here, Mildred * * * maintained minimal contact with Antonio between October 1991 and January 1992 and no contact whatsoever since January 8, 1992. Moreover, she has failed to plan for his future in any meaningful way since October, 1991."

The best interests of the child are paramount in deciding difficult cases like the one before us. Antonio, born on June 19, 1987, and apparently well placed in a preadoptive home, has not seen Mildred in three years. On this record, we cannot say that the trial justice's conclusion in terminating Mildred's rights was clearly wrong.

Last, Mildred argued that the trial justice erred in finding that § 15–7–7(1)(c) does not require out-of-home placement for a period of at least six months prior to the filing of the termination petition. Because Antonio had been placed in foster care outside the home for only three consecutive months before the termination petition was filed, from October 1991 (when Skuce brought Antonio back to Rhode Island) until January 1992 (when the termination petition was filed), Mildred argued that DCYF has failed to meet the statutory requirement that the child has been "in the care of a licensed or governmental child-placement agency * * * for a period of at least six (6) consecutive months." Section 15–7–7(1)(c). We disagree.

The statute requires simply that the child be "in the care of a licensed or governmental child-placement agency." The Family Court decree entered on June 20, 1988, committed Antonio "to the care, custody and control of the Department for Children and Their Families until further order of the Court." This decree remained in effect and has not been lifted or terminated. Mildred argued that the statute contains a presumption of placement outside the home. We decline the opportunity to incorporate such a requirement into the statute. Because the June 20, 1988 decree was never rescinded, the trial justice was not clearly wrong in finding that Antonio had been in the care of DCYF for at least six consecutive months prior to the filing of the petition to terminate on January 7, 1992.

We deny and dismiss the appeal and affirm the order of the Family Court. The papers in the case may be remanded to the Family Court.