**In re JENNIFER G.**

**No. 99–488–Appeal.**

Supreme Court of Rhode Island.

March 19, 2001.

Frank P. Iacono, Jr., E. Greenwich, Thomas J. Corrigan, Jr., Washington Crossing, PA, for Plaintiff.

G. Milne, For Defendant.

Present WEISBERGER, C.J., LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## PER CURIAM.

This case came before the Supreme Court on January 23, 2001, pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided. The respondent-mother, Rita Gardner, has appealed from a Family Court decree terminating her parental rights to her child, Jennifer,[1] pursuant to G.L.1956 § 15–7–7(a)(3).[2] After hearing counsels' argu-

---

1. The parental rights of the father, Thomas Hujara, were terminated on May 7, 1998.

2. General Laws 1956 § 15–7–7(a)(3) provided, at the time of the filing of the termination of parental rights petition, that:

ments and considering the memoranda submitted by the parties, this Court is of the opinion that cause has not been shown. Therefore, this appeal will be decided summarily.

When reviewing a termination of parental rights, this Court examines the record to determine whether legally competent evidence exists to support the findings of the trial justice. *In re Shaquille C.*, 736 A.2d 100, 101 (R.I.1999) (mem.); *In re Jennifer R.*, 667 A.2d 535, 536 (R.I. 1995); *In re Kristen B.*, 558 A.2d 200, 205 (R.I.1989). These findings are entitled to great weight, and this Court will not disturb them on appeal unless they clearly are wrong or if in making those findings the trial justice misconceived or overlooked material evidence. *See In re Christina V.*, 749 A.2d 1105, 1111 (R.I. 2000) (per curiam). The respondent raises four related contentions on appeal, which we will address in the order that she raised them in her pre-briefing statement. The respondent first contends that the trial justice erred in finding that the Department of Children, Youth and Families (DCYF) made "reasonable efforts" to reunify the respondent with her child pursuant to § 15-7-7(a)(3). More specifically, she asserts that DCYF failed to make any referrals after the respondent's psychiatric evaluation, which allegedly was a "condition precedent" to other steps toward reunification, and failed to secure joint counseling for the respondent and her child.

We disagree. DCYF prepared three case plans for the respondent, each of which addressed basic issues of "obtaining and maintaining an improved, stable state of mental health; improv[ing] parenting skills, provid[ing] a safe, stable environment and demonstrat[ing] an ability to provide appropriate supervision of her child." The trial justice properly considered that DCYF had developed these case plans, had provided numerous referrals, and had offered a wide range of services to the respondent that she continued to reject until the point of trial. The record reveals that as early as June 1996, the respondent was referred to Dr. John Parsons (Dr. Parsons) for a psychological evaluation. He subsequently diagnosed the respondent as suffering from depression and a passive-aggressive personality disorder. DCYF requested that the respondent contact the Community Counseling Center (CCC) for psychotherapy and a psychiatric evaluation. DCYF also referred the respondent to the Spurwink Parent Aid Program for parenting skills and education. Despite DCYF's efforts, the respondent was unsuccessfully discharged from CCC in August 1996, less than a month after entering the program. She also missed thirteen of eighteen scheduled appointments with her parent aide. From September 1996 to March 1997, the respondent refused mental health treatment. She finally reentered treatment at the CCC in April 1997 and was given a psychiatric evaluation in July 1997. The evaluation recommended that the respondent continue to engage in psychotherapy at CCC and take antidepressant medication. Nevertheless, following the psychiatric evaluation, the respondent continued to reject services offered by DCYF. By February 1998, she no longer was cooperating with mental health counselors at the CCC and she failed to consistently take her medication. We also note that the respondent engaged in a parent-child evaluation in January 1998 with Dr. Parsons, who found that the respondent was not receptive to interactions with her child. Accordingly, we agree with the trial justice, who found:

"The child has been placed in the legal custody or care of the department for children, youth, and families for at least twelve (12) months; and the parents were offered or received services to correct the situation which led to the child being placed, and pro-

vided further that there is not a substantial probability that the child will be able to return to the parents' care within a reasonable period of time considering the child's age and the need for a permanent home."

"The court also finds that the Department [DCYF] has offered services to the Respondent to correct the situation that led to the removal of her child. The enormous amount of evidence, exhibits and testimony shows that there was little more than the Department could have done for this Respondent. She was offered a parent aid, financial assistance, counseling, housing assistance, shelter referrals, case management, and visitation. Respondent's lack of compliance and defiant behavior are the main reasons for this tragedy."

■ The respondent next asserts that the trial justice erred in finding that she was an "unfit parent" at the time of trial pursuant to § 15–7–7(a)(3). We are not persuaded by this argument. The record indicates and the trial justice found that DCYF opened this case in May 1996 after the respondent failed to follow through on sexual abuse counseling for Jennifer, who had been molested by an adult neighbor. A DCYF social worker, Lori Tortolano, then observed that the child was permitted in or near the apartment of the man who had sexually abused her, that there was no food in the house, that the utilities were not working, and that the house was unsanitary. At this time, Jennifer, age seven,[3] also had severe developmental problems, demonstrating only the maturity of a toddler. A clinician who treated Jennifer testified that:

> "She entered with a history of physical abuse, neglect allegations surrounding sexual abuse, behavioral problems, some sexual acting out problems, urinating, defecating, tantruming. She needed around the clock supervision. Very primitive behaviors.
>
> * * *
>
> [S]he was very delayed developmentally, demonstrating a lot of two-year old behaviors. We had to train her, you know, on how to use the bathroom, how as to wash up, how to eat properly using you [sic] utensils and things like."

Jennifer had also missed school thirty-six times and had been tardy sixteen times. The respondent-mother also suffered from mental illness, including depression, anxiety, and a passive-aggressive personality disorder, all of which affected her ability to function daily and properly supervise Jennifer. She also failed to pay rent consistently and retain appropriate housing. Unfortunately, by the time of trial in February and March 1999 on the termination of parental rights petition (TPR), the record indicates that the respondent still suffered from serious mental illness and otherwise lacked the ability to properly supervise and parent her child. Accordingly, we determine that the trial justice properly found that the respondent was unfit.

■ The respondent also alleges that the trial justice erred in granting the TPR based on her failure to cooperate with DCYF services before the provision of the psychiatric evaluation. She alleges that DCYF made no attempt to secure an initial psychiatric evaluation other than a referral to the CCC, which "would not immediately conduct a psychiatric evaluation." We view the record quite differently. It demonstrates that the respondent was at fault for not securing a psychiatric evaluation earlier because she failed to cooperate with the necessary prerequisite counseling provided by CCC and because she refused mental health services from August 1996 to March 1997. The respondent simply failed to accept numerous services that DCYF provided her, both before and after the psychiatric evaluation.

■ Finally, the respondent alleges that the trial justice violated her constitutional due process rights by considering her conduct before the formal commitment of Jennifer to DCYF in reaching a decision on the TPR. The record reveals that the respondent's child was placed in the temporary custody of DCYF on June 13, 1996.

3. The record indicates Jennifer's date of birth as February 27, 1989.

On October 6, 1997, DCYF's temporary custody became one of formal commitment. On February 27, 1998, DCYF filed the TPR petition, which was some twenty months after the child had been placed in the temporary custody of DCYF. Since Jennifer was formally committed to DCYF custody in October 1997, the respondent alleges that the trial justice could have considered only her conduct that occurred during those four months from the time of commitment to the time that the TPR was filed. We disagree.

We recently decided in *In re Delicia B.*, 762 A.2d 1201, 1203 (R.I.2000), that § 15–7–7(a)(3) permits a TPR petition to be filed twelve months after DCYF obtains "temporary custody" of the child. We concluded that "formal commitment was not a prerequisite necessary to start the twelve-month parental termination clock in § 15–7–7(a)(3)." *Delicia*, 762 A.2d at 1203. In doing so, we did reaffirm that although a child may be placed in the temporary custody or care of DCYF before a formal adjudication of abuse, neglect or dependency, there is no requirement during that interim temporary custody or care period for the parent to comply with reunification services offered by DCYF. *See id.* at 1204. Yet, we stressed that if a parent was offered services to reunify the family, any refusal to cooperate with DCYF can be a factor that the family court later takes into consideration, along with other pertinent factors, when determining whether to terminate parental rights pursuant to a DCYF petition. *See id.; see also In re Christina V.*, 749 A.2d at 1110. In this case, then, the trial justice properly weighed and considered the respondent's failure to comply with services offered by DCYF both before and after her child's formal commitment. Accordingly, there was no error on the part of the trial justice.

Thus, the record reveals and the trial justice properly found that Jennifer had been in the care or custody of DCYF for more than twelve months; that the respondent was offered numerous services to correct the situation that led to the child being placed, and that no substantial probability existed indicating that the child would be able to return to the mother's care within a reasonable time. We conclude from the record before us that the evidence met the clear and convincing standard required to support the trial justice's finding that the respondent was unfit by reason of her conduct and the manner of living conditions that she imposed upon her child. All these conditions were seriously detrimental to Jennifer and revealed the respondent-mother's inability to properly care for her. *See In Re Ryan S.*, 728 A.2d 454, 457 (R.I.1999).

The record also contains abundant clear and convincing evidence to support the trial justice's finding that termination of respondent's parental rights would be in the best interests of Jennifer. *See In re Nicole B.*, 703 A.2d 612, 618 (R.I.1997); *In re Kristen B.*, 558 A.2d at 203. Indeed, the record indicates that since Jennifer had been placed in specialized foster care, she has been "thriving" emotionally, academically and physically.

Accordingly, the respondent's appeal is denied and dismissed. The decree of the Family Court granting the termination of the respondent's parental rights is affirmed, and the papers in this case are remanded to the Family Court.

Chief Justice WILLIAMS did not participate.