In re KYLE S.

No. 96–156–Appeal.

Supreme Court of Rhode Island.

April 14, 1997.

Anthony E. Angeli, Jr., Providence, Regina M. Gibb, Wakefield, Laureen Quaranto D'Ambra, for Plaintiff.

Janet Gilligan, Paula Rosin, Janice Weisfeld, Providence, for Defendant.

Before: Weisberger, C.J., Lederberg, Bourcier, and Flanders, JJ.

## OPINION

WEISBERGER, Chief Justice.

This case comes before the court on the basis of three certified questions from the Family Court pursuant to G.L.1956 § 9–24–27. The relevant facts are not in dispute and are as follows.

Kyle S. was born to respondents Janice Woodward Sabatini and Thomas Sabatini on March 18, 1995. As a result of the parents' previous involvement with the Department of Children, Youth and Families (the depart-

ment or DCYF), the hospital authorized a seventy-two-hour detention of Kyle and notified DCYF of his birth. The department then obtained an ex parte order of detention from the Family Court and took temporary custody of the child. Soon thereafter Kyle was placed in nonrelative foster care.

Two months prior to Kyle's birth, respondent-parents voluntarily agreed to terminate their parental rights to his older siblings.[1] Precipitating these terminations were allegations that four of the children were abused and/or neglected. The fifth child was removed from respondents' custody ex parte at birth because of the family's history of abuse and neglect. In granting the petition to terminate parental rights to the five children, the Family Court made no finding of parental unfitness.

On the basis of these voluntary terminations, DCYF filed a petition to terminate involuntarily respondents' parental rights to Kyle pursuant to G.L.1956 § 15–7–7($l$)(b)(iv), as amended by P.L.1994, ch. 233, § 1.[2] The respondents moved to dismiss the petition on the grounds that § 15–7–7($l$)(b)(iv) authorizes the involuntary termination of parental rights on the basis of a former termination only when the former termination of rights was *involuntary* following a judicial finding of parental unfitness.

The department, on the other hand, contends that § 15–7–7($l$)(b)(iv) applies to all former terminations of parental rights, whether voluntary or involuntary. It asserts that § 15–7–7($l$)(b)(iv) makes no distinction between the two types of terminations and thus should be read to encompass both. According to DCYF, the statute merely requires that a previous termination be accomplished by order of the court.

Following a hearing on the matter, the Family Court justice entered an order certi-

---

1. In August of 1994 DCYF filed involuntary petitions to terminate respondents' parental rights to their children. However, before the involuntary petitions could be considered by the Family Court, respondents voluntarily agreed to terminate their rights to the children. For respondent-mother, that meant all five children; and for respondent-father, that meant four of the five children.

2. The 1996 reenactment of G.L.1956 § 15–7–7 redesignated subsection (1)(b)(iv) as (a)(2)(iv) but left undisturbed its language. References herein will be to § 15–7–7(1)($l$)(b)(iv), the statutory designation in place at the time DCYF filed the petition to terminate involuntarily respondents' parental rights to Kyle.

fying the following three questions to this court:

"1. Does R.I.G.L. [§ ] 15–7–7($l$)(b)(iv), on its face, include both voluntary and involuntary terminations of parental rights[?]

"2. If [§ ]15–7–7($l$)(b)(iv) is read to include voluntary terminations, does that inclusion violate [respondent-parents'] [ ] right to due process of law[?][3]

"3. Does [§ ] 15–7–7($l$)(b)(iv), if read to include voluntary terminations, violate respondent-parents' [r]ight to Equal Protection under the law[?]"

The question of whether § 15–7–7($l$)(b)(iv) encompasses voluntary as well as involuntary terminations of parental rights is an issue of first impression for this court. We begin our analysis, therefore, with a review of the general principles of statutory construction.

 First and foremost, we follow the well-settled principle that in construing a statute, this court must ascertain and effectuate the intent of the Legislature. *Wayne Distributing Co. v. Rhode Island Commission for Human Rights*, 673 A.2d 457, 460 (R.I.1996); *Sorenson v. Colibri Corp.*, 650 A.2d 125, 128 (R.I.1994). In so doing, we examine " 'the language, nature and object of the statute,' " *Wayne Distributing Co.*, 673 A.2d at 460, "in light of circumstances motivating its passage." *Krikorian v. Rhode Island Department of Human Services*, 606 A.2d 671, 675 (R.I.1992). The statute itself must be viewed as a whole, and individual sections "considered in the context of the entire statutory scheme." *Sorenson*, 650 A.2d at 128. This court will then apply the statutory meaning most consistent with the statute's policies or purposes. *Bailey v. American Stores, Inc./Star Market*, 610 A.2d 117, 119 (R.I.1992).

With these principles in mind we begin our analysis with the clear language of § 15–7–7(1)(b)(iv), as amended by P.L.1994, ch. 233, § 1, which provides in pertinent part:

"**Termination of parental rights.**—(1) The court shall, upon a petition duly filed after notice to the parent and hearing thereon, terminate any and all legal rights of the parent to the child, including the right to notice of any subsequent adoption proceedings involving the child if the court, by clear and convincing evidence, finds as a fact *by clear and convincing evidence* that: * * *

"(b) The parent is unfit by reason of conduct or conditions seriously detrimental to the child; such as, but not limited to the following: * * *

"(iv) The child has been placed with the department for children, youth and families and the *court has previously terminated parental rights to another child* who is a member of the same family *and* the parent continues to lack the ability or willingness to respond to services which would rehabilitate the parent and provided further that the court finds it is improbable that an additional period of services would result in reunification within a reasonable period of time considering the child's age and the need for a permanent home." (Emphases added.)

Subsection (1)(b)(iv) of the statute is silent in regard to the nature of the previous termination proceeding to which it refers. The department contends that the statute should therefore be read to embrace both voluntary and involuntary terminations of parental rights. However, subsection (iv) also requires the state to prove by clear and convincing evidence a parent's continued unwillingness to respond to services designed to rehabilitate him or her and reunify the family. We are of the opinion that to include voluntary terminations within the purview of the statute belies legislative intent since state-sponsored rehabilitative services are neither contemplated nor required for the voluntary termination of parental rights.

In contrast, before the state may *involuntarily* terminate parental rights pursuant to subsections (1)(a), (1)(b)(i), or (1)(b)(iii) of § 15–7–7, it must provide the parent with services designed to encourage and strength-

---

**3.** The order refers to "petitioners' " right to due process. For purposes of this opinion, petition-ers are respondent-parents.

en the parental relationship,[4] G.L.1956 § 15–7–7(2)(a);[5] see also In re Alan W., 665 A.2d 877, 878 (R.I.1995); In re Kenneth, 439 A.2d 1366, 1370 (R.I.1982). If in spite of the state's efforts to reunify the family, the parent continues to act in a manner that is seriously detrimental to the child, the court may grant the state's termination petition. Section 15–7–7(2)(a); In re Michael F., 665 A.2d 880, 882 (R.I.1995). It is to these efforts that subsection (iv)'s provisions respecting rehabilitative services refer.

Further, limiting the applicability of § 15–7–7(1)(b)(iv) to former involuntary terminations is consistent with the entire statutory scheme of chapter 7 of title 15. The legislative intent behind chapter 7 of title 15 is to provide children who are in need with permanent and safe placement. Sections 15–7–5,[6] 15–7–6,[7] and 15–7–7 were enacted to effectuate this purpose. A parent's rights to the custody and management of a child may be terminated by any one of these three statutory mechanisms. Pursuant to §§ 15–7–5 and 15–7–6, however, a parent may relinquish his or her rights to a child without explanation or reason. In effectuating § 15–7–6 or § 15–7–5 in conjunction with § 15–7–6, the primary inquiry undertaken by the court is whether the surrender of parental rights is voluntary and in the best interests of the child—no inquiry into parental unfitness is made.

Before parental rights may be terminated by the state pursuant to § 15–7–7, however, the trial justice must be convinced by clear and convincing evidence that a parent is either unfit or incapable of providing a child with the proper care. Section 15–7–7; see also In re Kristina L., 520 A.2d 574, 579–80 (R.I.1987). Seven conditions are enumerated in § 15–7–7 as justifying the involuntary termination of parental rights.[8] Each of these

---

**4.** The state need not provide a parent with services designed to reunify the family when the parent's conduct toward the child is cruel or abusive. See G.L.1956 §§ 15–7–7(b)(i) and 15–7–7(2)(a), as amended by P.L.1994, ch. 233, § 1.

**5.** Section 15–7–7(2)(a) provides:

"In the event that the petition is filed pursuant to subsection (1)(a), (1)(b)(i), or (1)(b)(iii), the court shall find as a fact that prior to the granting of the petition such parental conduct or conditions must have occurred or existed notwithstanding the reasonable efforts which shall be made by the agency prior to the filing of the petition to encourage and strengthen the parental relationship[.]"

**6.** Section 15–7–5 provides:

"Consent required.—(a) The parents of the child * * * shall except as herein provided consent in writing to the adoption, or the petition shall be dismissed.

"(b)(1) Notwithstanding the provisions of subsection (a), when the petitioners are one of the natural parents of the child and his or her spouse * * * and the child is residing, at the time the petition is filed, with the petitioners, if the noncustodial parent refuse[s] to consent to the adoption, the court shall determine whether the noncustodial parent's rights shall be terminated involuntarily. In making the determination, the court shall apply the grounds for termination of parental rights set forth in § 15–7–7, Provided, however, That the petitioners need not demonstrate, and the court shall not require, efforts to encourage and strengthen the child's relationship with the noncustodial parent prior to terminating his or her parental rights.

"(2) Notwithstanding the provisions of subdivision (1) of this subsection, when the petitioners are one of the natural parents of the child and his or her spouse * * * and * * * the noncustodial parent refuses to consent to the adoption, then the court may grant the petition without a noncustodial parent's consent if the petitioners prove by clear and convincing evidence any of the grounds set forth in § 15–7–7(1)(a), (b), or (d)."

**7.** Section 15–7–6 provides in pertinent part:

"Waiver of parents' right to consent—Guardianship of agency. Any duly licensed child-placement agency in this state, * * * at the request of the natural parent, or parents of a child under eighteen (18) years of age, may * * * petition the family court for the termination of the rights of the natural parents of the child to consent to its adoption. * * * [A] hearing shall be had prior to the hearing on the petition for adoption in the family court, and if the family court finds after examination of the parent or parents that the parent or parents freely join therein, and that the granting of the petition is for the best interests of the child, it shall decree that in the hearing on the adoption of the child the consent of the natural parents as provided above shall be unnecessary and that the agency shall be the sole party to give or withhold consent. The granting of the petition to give or withhold consent to the aforesaid agency shall also make the agency the guardian of the child for all purposes." (Emphasis added.)

**8.** The grounds justifying the involuntary termination of parental rights pursuant to § 15–7–7 include: (1) the willful neglect of a parent to

conditions either explicitly or implicitly requires the court to make a finding of parental unfitness. In our opinion the Legislature's placement of subsection (iv) within the involuntary-termination statute is significant and indicative of its intent that only former involuntary terminations trigger application of the statute's provision. Under such an analysis a prior finding of unfitness absent rehabilitation becomes the basis for the state's present petition to terminate parental rights involuntarily.

■ The department's contention that § 15–7–7(1)(b)(iv) should be read to include voluntary terminations would produce results contrary to the policies underlying the act. Parents who choose to terminate their rights to a child out of concern for the child's well-being may find themselves subject to an involuntary-termination proceeding regarding another child subsequently born to them. Consequently, young single mothers who decide to relinquish custody of a child to caring adoptive parents more emotionally and financially secure than they may risk losing custody of other children born to them years later. Ill or disabled parents unable to care for their children would be similarly affected. Such a construction would have the effect of discouraging voluntary terminations that may be in a child's best interest. When the mechanical application of a statute "produces an absurd result or defeats legislative intent, this court will look beyond mere semantics and give effect to the purpose of the act." *Labbadia v. State,* 513 A.2d 18, 22 (R.I.1986) (quoting *State v. Delaurier,* 488 A.2d 688, 694 (R.I.1985)). In this instance the purpose of the act is best effectuated when § 15–7–7(1)(b)(iv) is applied solely to former involuntary terminations.

■ Our construction of § 15–7–7(1)(b)(iv) also conforms to this court's holding that a judicial finding of parental unfitness is a condition precedent to the involuntary termination of parental rights. *See In re Alan W.,* 665 A.2d at 878; *In re Antonio G.,* 657 A.2d 1052, 1057 (R.I.1995); *In re Kristina L.,* 520 A.2d at 579–80. Once the parents have been adjudged unfit, "the best interests of the child outweigh all other considerations." *In re Kristen B.,* 558 A.2d 200, 203 (R.I.1989). But unless the child "is likely to suffer physical and/or emotional harm, there is no reason to disturb the basic security of a family relationship." *In re Lester,* 417 A.2d 877, 880 (R.I.1980) (quoting *In re Jonathan,* 415 A.2d 1036, 1039 (R.I.1980)). Obviously the state's interest in finding the child an alternative home pursuant to § 15–7–7 arises only when it is clear that the natural parent cannot or will not provide the child with the basic necessities of life. *See Santosky v. Kramer,* 455 U.S. 745, 767, 102 S.Ct. 1388, 1402, 71 L.Ed.2d 599, 615 (1982); *Stanley v. Illinois,* 405 U.S. 645, 652, 92 S.Ct. 1208, 1213, 31 L.Ed.2d 551, 559 (1972) ("the State registers no gain towards its declared goals when it separates children from the custody of fit parents"); *In re Kristina L.,* 520 A.2d at 580 ("[a]bsent a finding that the parents are unfit, the state's interest in caring for the child is *'de minimis'* ").

■ Moreover, if the state were to force the breakup of a family over the objections of the natural parents without a finding of unfitness, the Due Process Clause of the Fourteenth Amendment would be offended. *See Santosky,* 455 U.S. at 753–54, 102 S.Ct. at 1394–95, 71 L.Ed.2d at 606; *Quilloin v.*

"provide proper care and maintenance for the child for a period of at least one year where financially able to do so," (2) the "[e]motional illness, mental illness, mental deficiency or institutionalization of a parent * * * of such a duration as to render it improbable for the parent to care for the child for an extended period of time," (3) "[c]onduct toward a child of a cruel or abusive nature," (4) placement of the child in DCYF custody and the chronic substance-abuse problem of a parent that prevents the return of the child within a reasonable period, (5) placement of the child in the custody of DCYF "and the court has previously terminated parental

rights to another child" in the family, and the parent continues to fail to "respond to services which would rehabilitate the parent," and the court finds it improbable that additional services would result in reunification of the family, (6) placement of the child in the custody of DCYF for at least twelve months, during which the parents have been offered services to correct the situation, but it is unlikely that the child will be able to return to the parents' care within a reasonable time, and (7) a parent's abandonment of the child. *See* G.L.1956 § 15–7–7, as amended by P.L.1994, ch. 233, § 1.

*Walcott*, 434 U.S. 246, 255, 98 S.Ct. 549, 555, 54 L.Ed.2d 511, 520 (1978); *Stanley*, 405 U.S. at 649, 92 S.Ct. at 1211, 31 L.Ed.2d at 557. In *Stanley*, the Supreme Court held that pursuant to the Due Process Clause of the Fourteenth Amendment, an unwed father's interest in retaining custody of his children entitled him to a hearing on his fitness as a parent *before* the children could be permanently removed from his custody. 405 U.S. at 649, 92 S.Ct. at 1211, 31 L.Ed.2d at 557.

Similarly, in *Santosky*, 455 U.S. at 753, 102 S.Ct. at 1394–95, 71 L.Ed.2d at 606, the Court held that natural parents have a fundamental liberty interest in the "care, custody, and management of their child." This fundamental liberty interest "does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State." *Id.* at 753, 102 S.Ct. at 1395, 71 L.Ed.2d at 606; *see also In re Antonio G.*, 657 A.2d at 1057. Consequently, before a state may irrevocably sever the rights of parents in their natural child, due process requires the state to prove its allegations of unfitness by at least clear and convincing evidence. *Santosky*, 455 U.S. at 747–48, 102 S.Ct. at 1391–92, 71 L.Ed.2d at 603. Until parental unfitness is proved, both "the child and [the] parents share a vital interest in preventing the erroneous termination of their natural relationship." *Id.* at 760, 102 S.Ct. at 1398, 71 L.Ed.2d at 611.

■ If we were to adopt DCYF's interpretation of § 15–7–7(1)(b)(iv), a parent's right to the custody of his or her child could be terminated without any judicial finding of unfitness. Interpreting the statute in this manner would violate a parent's federal constitutional right. *See Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). It is well settled that this court will presume legislative enactments of the General Assembly to be constitutional when such a construction is reasonably possible. *City of Pawtucket v. Sundlun*, 662 A.2d 40, 45 (R.I.1995). If a legislative enactment is susceptible of more

than one construction, we shall adopt the construction that comports with constitutional imperatives. *In re Advisory Opinion to the Governor (DEPCO)*, 593 A.2d 943, 946 (R.I.1991). By limiting the applicability of § 15–7–7(1)(b)(iv) to previous involuntary terminations, we avoid questions of unconstitutionality and best effectuate the purpose underlying the act.

In so construing § 15–7–7, we are not unsympathetic to the position of the state. It may be true, as DCYF contends, that respondents in this case are not fit parents. Indeed, the facts of the case reveal that DCYF has a history of involvement with the family and found it necessary to file petitions to terminate involuntarily their parental rights to Kyle's five older siblings. Nonetheless, absent a finding of parental unfitness an involuntary termination of parental rights may not take place. Nothing in this opinion, however, should be construed as discouraging DCYF from acting to terminate respondents' rights to Kyle pursuant to any other applicable provision of § 15–7–7.

We are satisfied that our interpretation of § 15–7–7(1)(b)(iv) best effectuates its underlying policies and best balances the interests of the parents, the child, and the state in guarding against erroneous decisions to remove a child from his or her natural family. Given our interpretation of the statute we do not reach the constitutional issues presented in certified questions 2 or 3.

■ For the foregoing reasons we conclude that § 15–7–7(1)(b)(iv) does not apply to the voluntary termination of parental rights. Accordingly we respond in the negative to the first question certified to us by the Family Court. The papers in the case may be remanded to the Family Court for further proceedings.