### In re RACHON W.

### No. 98–289–Appeal.

Supreme Court of Rhode Island.

May 15, 2000.

Thomas J. Corrigan, Jr., Frank P. Iacono, Jr., for Plaintiff.

Catherine Gibran, Paula Rosin, Providence, for Defendant.

Present WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

PER CURIAM.

The respondent, Gina I. (the mother), appeals from the termination of her parental rights to her son, Rachon W. The mother asserts that the trial justice misconceived or overlooked material evidence in finding her to be an unfit parent and that he erred in finding that the Department of Children, Youth and Families (DCYF) made reasonable efforts to reunify her with her son. In addition, she asserts that the trial justice also erred in finding that termination of her parental rights was in the best interests of the child, because her son neither is in a pre-adoptive setting nor in a foster home and, given his behavioral

problems, it is unlikely that he ever will be integrated into a family home placement.[1]

This case came before a single justice of this Court, who directed the parties to appear and show cause why the issues raised in this appeal should not be summarily decided. After reviewing the memoranda submitted by the parties and hearing the arguments of counsel, we are of the opinion that no such cause has been shown, and we proceed to resolve her appeal at this time.

DCYF first became involved in this case in July 1990, when one-day-old Rachon tested positive for cocaine. The mother admitted neglect and Rachon was committed to the care, custody and control of DCYF, but was placed with the mother on the condition that she comply with a DCYF case plan. This case plan was the first of eleven case plans that DCYF prepared for the mother over a five-year period, and each contained similar objectives/tasks. Essentially, the plans required the mother to: (a) provide a safe and stable environment for Rachon; (b) obtain and maintain a substance-free lifestyle; (c) attend substance-abuse counseling and submit to urine and blood screening; and, (d) provide appropriate living accommodations for herself and her son.

The record reveals that DCYF, through various of its social workers, has made extensive efforts to assist the mother in case planning issues, including issues of alcohol and drug use, transportation, visitation and parenting. In addition, it made four reunification attempts, making rental payments in connection with at least one of those attempts. However, none was successful.

Since her first contact with DCYF, the mother has been in and out of several detoxification units and has attended various treatment programs at places such as the Talbot Treatment Centers, Inc., Wilson House, and the Adult Correctional Institutions' (ACI) Marathon House program. However, over the years, the mother frequently failed to provide screens, was often uncooperative, and regularly missed scheduled appointments for programs designed to assist in the reunification with her son. The record also reveals that the mother was convicted between February 1993 through March 1995 of two separate charges of loitering for indecent purposes. Other convictions were for: soliciting from a motor vehicle, possession of cocaine, disorderly conduct and violations of probation. During her incarceration at the ACI, the mother attended parenting classes with her toddler son.

Despite her attendance at many substance-abuse programs, the mother was unable to overcome her substance-abuse problem. On November 1, 1995, DCYF filed a termination of parental rights petition. Despite that filing, DCYF nonetheless continued to provide visits for the mother and her son, many of which were favorable; but, she also canceled some visits in 1996, and did not visit with Rachon at all from July 1996 to May 1997. In May 1997, four months before the trial on the termination petition, the mother began yet another substance-abuse program at the Talbot Treatment Center. In this new program, the mother was treated for psychological problems, in addition to her substance-abuse problems. Apparently, she was substance-free at the time of the trial.

At trial, there was evidence that in April 1996, the mother was referred to a psychiatrist, but that she failed to keep her appointments. In December 1996, it was recommended to her that she attend a combined mental and substance-abuse counseling program, but because she felt that the program was too far from her residence, no referral was made. The mother's substance-abuse counselor at the Talbot Treatment Center testified that her current treatment would continue for an additional year. After acknowledging that

---

1. A third issue was waived orally at the hearing.

the mother previously had relapsed, even after using psychotropic drugs, the counselor testified that her "positive prognosis is very much entwined with her ability to maintain herself on the psychiatric treatment."

After reviewing all the evidence, the trial justice found that although the mother had been provided with services to assist her in the goal of reunification with her son, her efforts to complete these programs were unsuccessful. The trial justice determined that despite the mother's recent progress, the mother had a chronic substance-abuse problem and, based on her past failures and relapses, combined with the fact that no assurances could be given that there would be no further relapses, her prognosis was such that her son would not be able to return to her within a reasonable time period. Consequently, the petition for termination of the mother's parental rights was granted. A decree was entered on August 9, 1996, and the mother now appeals.

On appeal, the mother criticizes DCYF for not referring her to substance-abuse programs that would have treated her underlying mental problems, and she asserts that the trial justice was clearly wrong when he determined that she was an unfit parent. She claims that the trial justice ignored the undisputed evidence that her prognosis was good and that she had made great strides in her present program. In addition, she asserts that terminating her parental rights would serve no beneficial purpose because her son neither is in a pre-adoptive setting nor in a foster home and, given his behavioral problems, it is unlikely that he will ever be integrated into a family home placement.

■ In cases involving the termination of parental rights in which the trial justice sits without a jury, his or her findings are entitled to great weight and will not be disturbed on appeal unless they are clearly wrong or the trial justice misconceived or overlooked material evidence. *See In re Kelly S.*, 715 A.2d 1283, 1288 (R.I.1998);

*In re Ryan S.*, 728 A.2d 454, 457 (R.I.1999) (per curiam); *In re Shaquille C.*, 736 A.2d 100, 101 (R.I.1999) (order). "Consequently we examine the record to determine whether any legally competent evidence exists to support the trial justice's findings." *In re Kelly S.*, 715 A.2d at 1288.

■ Before granting a termination of parental rights petition, the Family Court justice must find by clear and convincing evidence that DCYF has made reasonable efforts to reunite the parent with the child, and that despite those efforts, the parent is unfit. *See In re Ryan S.*, 728 A.2d at 457; *In re Shaquille C.*, 736 A.2d at 101. " 'Reasonable efforts' is a subjective standard subject to a case-by-case analysis, taking into account, among other things, the conduct and cooperation of the parents." *In re Ryan S.*, 728 A.2d at 457 (quoting *In re Nicole B.*, 703 A.2d 612, 618 (R.I.1997)). "Prior to an adjudication of unfitness, the parents and the child share an interest in avoiding the erroneous termination of this natural relationship." *In re Nicole B.*, 703 A.2d at 615 (citing *In re Kyle S.*, 692 A.2d 329, 334 (R.I.1997)). "[O]nce a parent has been adjudicated unfit, the balance shifts so that the 'best interests of the child outweigh all other considerations.' " *Id.* (quoting *In re Kristen B.*, 558 A.2d 200, 203 (R.I.1989)).

■ After reviewing the record, we are of the opinion that the trial justice did not err when he terminated the mother's parental rights because the record is replete with legally competent evidence to support his findings. The evidence reveals that DCYF developed eleven case plans and made extensive efforts, through its social workers, to assist the mother with referrals for drug and alcohol treatment, transportation, and for providing visits while she was incarcerated. In addition, it made four reunification attempts, providing rental payments in connection with at least one of those attempts. Unfortunately, the mother's failure to cooperate, her incarcer-

ations, and her repeated relapses constantly undermined DCYF's efforts.

The mother faults DCYF for failing to refer her for psychiatric help, and asserts that because it was undisputed that her prognosis was good and that she had made great strides in her present program, the trial justice erred when he found her to be unfit. However, although her counselor did testify that her prognosis was good, she qualified that prognosis by acknowledging that the mother was "certainly" at risk for relapse and that her future progress depended on her "ability to maintain herself on the psychiatric treatment." The trial justice found that given the mother's past failures and relapses, coupled with the fact that she would require treatment for at least another year with no assurances of success, it was unlikely that her son would return to her custody within a reasonable time. The trial justice also found that DCYF acted appropriately with respect to the mother's mental health problems "based on the information available to the social worker" at that time. We cannot say he erred.

The mother additionally contends that because her son neither is in a foster home nor a pre-adoptive home, it is unlikely that he ever will be integrated into a family home placement because of his behavioral problems. From this contention she concludes that it is in her son's best interest that he remain with her.

■ General Laws 1956 § 15–7–7 governs termination of parental rights. Before a parent's rights may be terminated, certain findings must be established by clear and convincing evidence. *See* § 15–7–7(a). Although the statute requires that "[u]pon the filing of a termination of parental rights petition, the agency has an affirmative duty to identify, recruit, process and approve a qualified family for adoption or other permanent living arrangement for the child" (§ 15–7–7(b)(3)), there is no requirement that the child actually be placed in such a living arrangement before a parent's rights may be terminated. Indeed,

§ 15–7–7(g), which provides for a review of the child's residential status within thirty days of a final termination decree, supports the notion that a parent's rights may be terminated regardless of the child's living arrangements. Thus, because the trial justice followed the requirements established by § 15–7–7, we conclude that he did not err when he terminated the mother's parental rights.

For the foregoing reasons, the mother's appeal is denied and the decree of the Family Court terminating the mother's parental rights is affirmed. The papers of this case may be remanded to the Family Court.