**In re DAVID L.**

No. 2004–76–Appeal.

Supreme Court of Rhode Island.

July 12, 2005.

Karen A. Clark, Esq., Providence, for Petitioner.

Catherine A. Gibran, Esq., Providence, for Respondent.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

PER CURIAM.

This is a mother's appeal from a Family Court decree terminating her parental rights to her son David, born November 5, 2001.[1] The case came before the Supreme Court for oral argument pursuant to an order directing the parties to show cause why the issues raised in this appeal should not summarily be decided. After hearing the arguments of counsel and examining the memoranda filed by the parties, we are of the opinion that cause has not been shown and proceed to decide the appeal at this time. For the reasons hereinafter set forth, we affirm.

On November 6, 2001, a Child Protective Investigator (CPI) from the Department of Children, Youth and Families (DCYF) was assigned to the case of Baby Boy L.,[2] who had been born one day earlier cocaine-positive with severe breathing problems and was in a special-care nursery at Women and Infants Hospital. The CPI met with the infant's mother, Mary Ellen L., at Landmark Hospital where she had delivered the baby. The mother admitted to having used cocaine three days before the birth because of an incident of domestic violence involving the child's father.[3] She also informed the CPI that she suffered from bipolar disease and had not taken her medication during pregnancy. She further said that she was homeless and did not have a place to take the baby. As a child, she had been in DCYF care herself. The mother did not request to see the child on that day. On November 7, 2001, DCYF filed an *ex parte* petition alleging that David was a dependent, neglected, and abused child.

John Barletta, a DCYF social caseworker, was assigned to the case on November 9, 2001. He telephoned the mother, gave her his name and contact information, and told her to call him when she was discharged from the hospital. He never received a response from her. On or about November 20, 2001, the case was transferred to another DCYF social caseworker, Suzanne Parenteau. At this point, David was still in the hospital, but the mother's whereabouts were unknown. Ms. Paren-

---

1. By a decree entered on May 5, 2003, the father voluntarily terminated his parental rights to David.

2. Because the mother left the hospital without signing the birth certificate, DCYF filed a motion to name the child on May 30, 2002, which subsequently was granted.

3. The biological father's paternity was established through a paternity test in June 2002.

teau sent "search" letters to various agencies and utilities, and contacted Ms. L.'s parents, all in an effort to locate her. These efforts proved unsuccessful, however, and on December 3, 2001, the mother was defaulted. After unsuccessfully attempting to place David with his maternal grandparents, the baby was placed in non-relative foster care. Ms. Parenteau was unable to establish contact with the mother until June 5, 2002, when David's father informed her that Ms. L. was at the Adult Correctional Institutions (ACI). Ms. Parenteau visited her there that same day. During this visit the mother, for the first time, expressed an interest in seeing her child. Ms. Parenteau then discussed case planning with her, and explained that for reunification to occur, she would be expected to undergo substance abuse and mental health treatment and would have to obtain housing. She also informed the mother about David's medical condition. On June 11, 2002, the mother called Ms. Parenteau and requested a visit. The caseworker contacted the ACI and arranged for a visit to take place on June 18. However, the mother was released from the ACI the day before the visit was to take place and did not contact Ms. Parenteau again. On July 26, 2002, Ms. Parenteau learned that the mother was again at the ACI, serving a sentence until approximately December 23, 2003. In September 2002, David was diagnosed with congenital myatonic dystrophy, a genetic disorder, requiring intensive intervention and medical care.

On September 3, 2002, DCYF filed a petition to terminate parental rights (TPR), alleging (1) that David had been placed in the legal custody of DCYF for at least twelve months and there was not a substantial probability that he would be able to return safely to his parents' care within a reasonable period, and (2) that the parents had abandoned or deserted the child. The petition later was amended to include an allegation that the mother's parental rights to another child previously had been terminated, and that she continues to lack the ability or willingness to respond to rehabilitation services.[4]

At her arraignment on September 24, 2002, and again at a court hearing on October 22, 2002, the mother asked to see David. On this latter date, she informed Ms. Parenteau that she was at Transformation House in Exeter, where she was receiving substance abuse services, life skills training, and job training in a six-month program for nonviolent offenders. In December 2002, the court ordered that the mother receive all David's medical records, and in January 2003, the mother met with the child's neurologist. She again expressed her willingness to provide care for David if she received adequate services. Ms. Parenteau testified at trial that she had drafted two case plans, but that the mother had not signed either one.

A trial on the termination petition took place between February 13 and March 7, 2003.[5] Lauranne Howard, a counselor at the Phoenix House Transformation Program with extensive experience in the field of substance abuse treatment, testified for

---

4. At trial, DCYF withdrew its first allegation, and the petition proceeded on the latter two allegations.

5. From birth until trial, David lived with the same foster family. The maternal grandparents at one time expressed an interest in adopting him, but withdrew after speaking with the child's neurologist. Another pre-adoptive family, identified by the neurologist, also declined to continue with the process. During the appeal it was disclosed that David is currently living with a foster family who, although *not willing to adopt him*, intends to continue the placement indefinitely. It is not clear, however, whether this is the same foster family he was placed with at birth.

the mother. She said that Ms. L., who was undergoing psychological counseling at the time, was very bright, motivated to change her life, and committed to regaining custody of David. She also recognized, however, that the mother had experienced some adjustment problems in the program, had difficulties accepting authority, and that substance abuse treatment for her probably would be a lifelong process.

After carefully considering the evidence, the trial justice determined that DCYF had proven the two remaining allegations by clear and convincing evidence, found termination to be in the child's best interest, and granted the TPR. A final decree terminating the mother's parental rights was entered on August 25, 2003, from which she timely appealed.

On appeal, the mother concedes that DCYF proved a *prima facie* case of abandonment pursuant to G.L.1956 § 15–7–7(a)(4), but argues that she, in fact, successfully rebutted this *prima facie* case. In addition, she argues, the trial justice committed clear error by terminating her parental rights under § 15–7–7(a)(2)(iv) because she had demonstrated before trial that she no longer was acting in a manner detrimental to David. Third, the mother asserts that the trial justice erred in finding her to be an unfit parent to David because at the time of trial she was engaged in a voluntary residential substance abuse treatment program, had achieved sobriety, and was effectively addressing her mental health needs. Lastly, she contends that the trial justice erred in finding that terminating her rights to the child would be in David's best interest.

■ In reviewing appeals from TPR rulings, this Court examines the record "to establish whether the hearing justice's findings are supported by legally competent evidence." *In re Shawn B.*, 864 A.2d 621, 623 (R.I.2005) (citing *In re Abby D.*, 839 A.2d 1222, 1225 (R.I.2004)). "The trial justice's findings 'are entitled to great weight, and this Court will not disturb them on appeal unless the findings are clearly wrong or the trial justice misconceived or overlooked material evidence.'" *Id.* (quoting *In re Abby D.*, 839 A.2d at 1225).

■ We are satisfied that there is sufficient evidence in the record to support the trial justice's factual findings and legal conclusions.

With respect to abandonment, § 15–7–7(a)(4) provides that the court shall terminate any and all legal rights of a parent, if the court finds by clear and convincing evidence that:

"The parent has abandoned or deserted the child. A lack of communication or contact with the child for at least a six (6) month period shall constitute prima facie evidence of abandonment or desertion. In the event that parents of an infant have had no contact or communication with the infant for a period of six (6) months the department shall file a petition pursuant to this section and the family court shall conduct expedited hearings on the petition."

Here, the uncontradicted evidence establishes that the mother left her newborn infant in the hospital without even signing the birth certificate and giving the child a name. Although provided with the name and telephone number of the DCYF caseworker, she made no attempt to inquire about the child's welfare, much less attempt to visit with him. It was not until seven months after David's birth, when Ms. Parenteau learned that the mother was incarcerated at the ACI, that the mother first requested a visit. Then Ms. Parenteau arranged for a visit to take place at the ACI, but when the mother was released, she neither informed DCYF nor

did she then contact the agency in an effort to establish any type of relationship with David. As Ms. L. acknowledges herself, it was not until September 2002, after the TPR was filed, that she "continuously requested visitation from DCYF." She further asserts that she has read David's medical records, met with his neurologist, affirmed her desire to parent David, and engaged in residential treatment, solely motivated by the hope of gaining custody. Such efforts are commendable, but sadly are too little and too late to establish a meaningful relationship with her child. Nor do they undermine the trial justice's finding of abandonment.

■ We consistently have held that " 'the parent, not DCYF, whose children are in the care of an authorized agency * * * is responsible to substantially and repeatedly maintain contact with the children,' even when the parent is incarcerated." *In re Shawn B.*, 864 A.2d at 623 (quoting *In re Diamond I.*, 797 A.2d 1076, 1078 (R.I.2002) (mem.)). Further, "[a] parent who makes only 'halfhearted or no attempts to visit or contact his or her child within the six-month statutory period' has abandoned the child." *Id.* (quoting *In re Abby D.*, 839 A.2d at 1225). Here, the trial justice's finding of abandonment and/or desertion is correct and well supported by the evidence.

■ The mother further argues on appeal that the trial justice erred when he terminated her parental rights to David under § 15–7–7(a)(2)(iv). This section provides that the court shall terminate parental rights when:

"(2) The parent is unfit by reason of conduct or conditions seriously detrimental to the child; such as, but not limited to, the following:"

" * * *

"(iv) The child has been placed with the department for children, youth, and families and the court has previously involuntarily terminated parental rights to another child of the parent and the parent continues to lack the ability or willingness to respond to services which would rehabilitate the parent and provided further that the court finds it is improbable that an additional period of services would result in reunification within a reasonable period of time considering the child's age and the need for a permanent home." Section 15–7–7(a)(2)(iv).

With regard to this section, the statute also provides that DCYF has no obligation to "engage in reasonable efforts to preserve and reunify a family." Section 15–7–7(b)(1). Rather, the "only requirement is that there has been a previous finding that a parent has been proven to be unfit, *In re Micaela C.*, 769 A.2d 600, 604 (R.I.2001) * * * and that 'the parent continues to lack the ability or willingness to respond to services which would rehabilitate the parent.' " *In re Diamond I.*, 797 A.2d at 1078 (quoting § 15–7–7(a)(2)(iv)). It is undisputed in the present case that the mother was previously found unfit when her parental rights to her daughter Stacy, who was born cocaine-positive on November 29, 1995, were terminated on December 6, 1996. As the trial justice noted, the court in the earlier case found (1) that the mother had not seen her child for ten months, (2) that she had a substance abuse problem, and (3) that the child was born cocaine-positive. As the trial justice aptly asked, "Where is the change?" He recognized that at the time of trial, the mother was sentenced to the ACI with a placement at a residential treatment facility, but said "there is no concrete evidence on how she would do once placed in the community to deal with her substance abuse problem, a lifelong problem to be dealt

with." He then found "it improbable that an additional period of services would result in reunification within a reasonable period of time considering the child's age and the need for a permanent home." We perceive no cause to disturb these findings.

■ The mother's third assertion on appeal is that at the time of the trial she was not "presently unfit." She points to the evidence that she was in residential treatment and had committed herself to reunification with David. She further emphasizes the expert opinion of Lauranne Howard, who indicated that the mother's prognosis for success was very favorable.

The record discloses that the trial justice considered Ms. Howard's testimony in some detail. He noted that the mother was accepted into the Transformation House program because she had expressed a "sincere willingness to change her lifestyle, being motivated to get custody of her son David back." He said that she had completed the initial eight-week orientation phase of the program, and had experienced some adjustment problems, as a result of which she was placed on a speaking ban for two and a half to three weeks. The trial justice also considered Ms. Howard's testimony that the mother's behavior had improved for the previous three weeks and that her prognosis was very good. He concluded, however, that in light of the mother's lifelong problem with substance abuse, there was no "concrete evidence on how she would do once placed in the community," adding that she is "no closer to reunification with David than she was at the time of David's birth."[6] He further found that "no amount of additional service would make reunification possible within a reasonable time." His findings are not clearly wrong and are entitled to great weight.

■ In her last argument on appeal, the mother asserts that terminating her parental rights is not in David's best interest. She argues that several attempts at finding a pre-adoptive home for David have failed and that he currently is living with a foster family who does not intend to adopt him. As we often have confirmed, however, placement in a pre-adoptive home is not a prerequisite for a termination of parental rights. *In re Alex B.*, 752 A.2d 484, 485–86 n. 2 (R.I.2000) (citing *In re Amanda C.*, 688 A.2d 863, 864 (R.I.1997)); *In re Rachon W.*, 750 A.2d 963, 967 (R.I. 2000). Indeed, § 15–7–7(g) requires the Family Court to review the status of a child who has not been placed in a pre-adoptive home within thirty days from the date of a final termination decree. *See In re Rachon W.*, 750 A.2d at 967.

■ The termination of parental rights is, by definition, tragic. This Court is mindful of the mother's intense struggles with mental illness, substance abuse, domestic violence, and homelessness, as well as the fact that she herself had been in DCYF care as a child. However, once a parent's unfitness is established, the court's primary focus must be on the child's best interest; "the best interests and welfare of the child outweigh all other considerations." *In re Stephanie*, 456 A.2d 268, 271 (R.I.1983) (quoting *In re David*, 427 A.2d 795, 801 (R.I.1981)). The best interest of a child involves the determination of the right of a minor child "to reasonable care and maintenance, freedom from abuse or neglect, and * * * an opportunity to spend the remainder of [his or her] childhood in a family setting in which

---

6. Unfortunately, it was disclosed at oral argument that the mother was at the time serving another sentence at the ACI.

[the child] may grow and thrive." *In re Raymond C.,* 864 A.2d 629, 634 (R.I.2005) (quoting *In re Stephanie,* 456 A.2d at 271). Children "are entitled to permanency; they should not have to wait for an indeterminate period of time to find out if their parents will successfully obtain and maintain a substance free lifestyle." *In re Eric K.,* 756 A.2d 769, 772–73 (R.I.2000). We are satisfied that there is ample evidence in the record to support the trial justice's finding that DCYF proved by clear and convincing evidence that granting the petition is in David's best interest.

Accordingly, the decree of the Family Court terminating the mother's parental rights is affirmed. The papers in this case shall be remanded to the Family Court.