### In re STEPHANIE.

### No. 82–233–Appeal.

Supreme Court of Rhode Island.

Feb. 11, 1983.

---

John Edward Farley, Chief Legal Counsel for Dept. for Children and Their Families, Providence, for petitioner.

Ernest V. Begin, Pawtucket, for respondent.

## OPINION

KELLEHER, Justice.

This is an appeal from a decree of the Family Court terminating the parental rights of a mother, to whom we shall hereinafter refer as Susan. The termination hearing was based upon a petition instituted by the Department of Children and Their Families (DCF or the department) on the grounds that Susan was an unfit parent by "reason of conduct or conditions seriously detrimental to the child * * * [namely] [e]motional illness, mental illness, [or] mental deficiency * * * of such duration as to render it improbable for the parent to care for the child for an extended period of time." General Laws 1956 (1981 Reenactment) § 15–7–7(b)(1). As the hearing was about to begin, it was agreed that an additional ground for termination would be subsection (c) of § 15–7–7, which provides a basis for such action when "[t]he parent has a child in the care of a licensed or governmental child placement agency, either voluntarily or involuntarily, for a period of at least six (6) months and the court further finds that the integration of the child into the home of the parent is improbable in the foreseeable future due to conduct or conditions not likely to change."

The termination hearing extended over a period of eight days as the trial justice listened to testimony presented by two DCF counselors, two psychiatrists, a psychiatric nurse, a clinical psychologist, and a neuropsychologist. All but the neuropsychologist testified in support of the termination petition. We have no intention of detailing the evidence presented during this period. Rather, we shall give a brief description of Susan's background as well as a few of the observations made by some of the witnesses who appeared at the hearing.

Susan was born in the spring of 1944. Her father, who was a chronic alcoholic, died sometime in his fifties. Susan left school in the ninth grade and began work as an unskilled laborer in a jewelry manufacturing plant. There she met her husband. They were married in 1963, and shortly thereafter Susan gave birth to a son. Four years later the couple separated and were subsequently divorced. However, the son continued to live with Susan.

Stephanie was born on August 22, 1979. Stephanie's father, who is a relative of one of Susan's neighbors, had three or four children of his own and was separated from his wife. Stephanie's arrival caused Susan's son to pack his bags and leave Rhode Island to move in with his father. At 12 a.m. on September 18, 1979, Susan, with Stephanie in her arms, was found sitting on a curbstone. She insisted that it was 6 a.m., not midnight, and that she was waiting for the bus to come by because she could not stay in her house as it had been poisoned. In actuality the poisoning episode came about because the sewer had backed up into Susan's apartment. Susan was admitted to Butler Hospital, and Stephanie since the curbstone incident has been subject to foster placement almost constantly, with the exception of three days spent with her mother in October 1979.

The caseworkers recounted a series of events that occurred while they employed a vast array of community resources, both private and governmental, in DCF's attempts to keep the mother and child together. The mother, they said, looked forward to seeing Stephanie but exhibited no desire whatsoever to care for the infant. On one visitation things were going "fairly well," but as the worker was leaving Susan's apartment, Susan removed the sofa cushion, pointed to some food particles, and told the worker "they were out to get her." The workers also reported that during the three-day period in October 1979 when Stephanie was at home with her mother, Susan appeared at the emergency room of Roger

Williams Hospital complaining about the infant's continual crying and threatening to put the child "in another world." At a hearing on a petition to have Stephanie declared a dependent child, the mother continually insisted that the trial judge was not a trial justice at all but a priest.

One of the psychiatrists who had first treated Susan during her stay at Butler Hospital and again later when she was an out-patient at the Providence Mental Health Clinic told the trial justice that Susan was suffering from paranoia. Her delusions, he said, were precipitated by stress. In response to an inquiry from the trial justice, this witness stated that he did not believe that at that time Susan was capable of caring for Stephanie on a permanent basis. He also thought that there was no hope that Susan at some time in the foreseeable future would ever arrive at the point, because of treatment or otherwise, at which she could assume the role of a full-time parent. The other psychiatrist was of the opinion that Susan was schizophrenic. He also said the likelihood of physical and emotional harm to the child in the event that the mother was allowed to "parent the child" was "very, very high." He also informed the trial justice that there was no treatment that would make Susan capable of "parenting this or any other child in the foreseeable future."

The sole witness presented in behalf of the mother was the neuropsychologist. She was of the belief that Susan's ailment was physical rather than mental. She attributed Susan's difficulty to a fall that had occurred early in December 1978. According to this expert, if Susan was placed on a program of anticonvulsant medication, she would soon be able to discharge the duties of motherhood in an acceptable fashion. The neuropsychologist estimated such an improvement could well become realized within a four-to-six-week treatment period. The witness made it clear that, as far as she was concerned, there was no indication that Susan "could not take care of her child if she so chose."

Six days after the conclusion of the evidence and the presentation of arguments, the trial justice rendered a bench decision in which he found that DCF had made a reasonable effort to reunite the mother and child but that the mother, although interested in visiting with Stephanie, showed a lack of concern about her own problems as well as an indifference to taking any steps to resolve those problems. He stated that Susan was suffering from a variety of mental disabilities that were of such severity that it was unlikely that she would ever be able to care for her daughter for any extended period. The trial justice went on to observe that there had been no change in the behavior of the mother which would warrant Stephanie's return to her and that any further deferral of the adoption process would only serve to lessen Stephanie's chances of being adopted. The DCF, he noted, had proved the allegations of its petition by the necessary quantum of clear and convincing evidence.

 Although Susan's counsel argues with commendable vigor as he faults the trial justice's conclusions, he presses no objections to any of the evidentiary rulings made by the trial justice. Thus, our appellate responsibility in the controversy is limited to a determination of whether the trial justice's factual findings are supported by the evidence or whether he has misconceived or overlooked material evidence or is otherwise clearly wrong. *In re William, Susan, and Joseph,* R.I., 448 A.2d 1250, 1257 (1982); *In re Kenneth,* R.I., 439 A.2d 1366, 1369 (1982). In actuality counsel's argument seeks a reevaluation of the evidence and amounts to nothing more than a fervent song of praise for the four-to-six-week treatment plan formulated by the neuropsychologist. These contentions involve matters that fall within the exclusive province of a trial court, not of an appellate tribunal. *Walton v. Baird,* R.I., 433 A.2d 963 (1981); *Kem Manufacturing Corp. v. Howland,* 121 R.I. 601, 401 A.2d 1284 (1979); *Fournier v. Ward,* 111 R.I. 467, 306 A.2d 802 (1973).

■ At this juncture we think it appropriate to allude to our recent comment in *In re David,* R.I., 427 A.2d 795, 801 (1981), where we said:

"Again we reiterate that in cases involving termination of the parental right to consent or to withhold consent to adoption, we are dealing with a balancing of the interests of three parties. This is not a matter merely of interference with a private right by a state agency. The process involves the determination of the right of a minor child to reasonable care and maintenance, freedom from abuse or neglect, and the right to be given an opportunity to spend the remainder of his or her childhood in a family setting in which the child may grow and thrive. * * [W]e have long espoused the position that the rights of parents are a most essential consideration, but we further recognize that the best interests and welfare of the child outweigh all other considerations."

The General Assembly has authorized DCF, in instances where parents by reason of their mental and emotional infirmities are presently, and for the foreseeable future, unable to care for their children properly, to intervene and take such steps as will afford the affected children the opportunity of being maintained in permanent and secure homes that can provide them with the proper care and education. Here, the trial justice recognized the state's obligation and properly balanced the competing interests. His conclusions about the applicability of both §§ 15–7–7(b)(1) and 15–7–7(c) are amply supported by clear and convincing evidence.

Susan's appeal is denied and dismissed, the decree appealed from is affirmed, and the case is remanded to the Family Court.