In re RAYMOND C. et al.

No. 2002–329–Appeal.

Supreme Court of Rhode Island.

Jan. 21, 2005.

Frank P. Iacono, Jr., Esq. (CASA), Thomas J. Corrigan, Jr. (DCYF), for Plaintiff.

Diana deGroof, Esq. (RILS), Chester R. Wilkie, Esq. (PD's), Paula Rosin, Esq. (PD's), Providence, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, and ROBINSON, JJ.

## OPINION

PER CURIAM.

This case came before the Supreme Court on October 27, 2004, pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not summarily be decided. The respondent-parents, Maryann (Maryann) and Raymond Clayton (Raymond Jr.), have appealed[1] from a Family Court decree, entered January 2, 2002,[2] terminating their parental rights to their children, Raymond III, Timothy, April, and Tiffany, pursuant to G.L.1956 § 15–7–7(a)(3).[3] Af-

---

**1.** Maryann and Raymond Jr. filed separate appeals, which have been consolidated.

**2.** Although the record was perfected on May 30, 2002, the pre-briefing conference was delayed until July 2004. During that time nine continuances were sought: four by the Department of Children, Youth and Families; two by Rhode Island Legal Services; and three by counsel for Maryann; although, the Office of the Public Defender timely filed its

first pre-briefing memorandum. The number of continuances granted in this case is excessive and has resulted in an unreasonable delay of this appeal.

**3.** General Laws 1956 § 15–7–7(a)(3) provides that the court will terminate parental rights to a child if:

"The child has been placed in the legal custody or care of the department for children, youth, and families for at least twelve

ter hearing the arguments of counsel and considering the memoranda that the parties submitted, this Court is satisfied that cause has not been shown. Therefore, we summarily will decide this appeal.

When reviewing orders terminating parental rights, "this Court must examine the record to determine whether legally competent evidence exists to support the findings of the trial justice." *In re Eric K.*, 756 A.2d 769, 772 (R.I.2000). These findings are entitled to great weight and will not be disturbed unless the trial justice was clearly wrong or misconceived or overlooked material evidence. *In re Dennis P.*, 749 A.2d 582, 585 (R.I.2000).

The children, Raymond III,[4] Timothy,[5] April,[6] and Tiffany,[7] were placed under court-ordered supervision in the family home on September 10, 1997, after both parents admitted to neglect. The children subsequently were committed to the care and custody of the Department of Children, Youth and Families (DCYF), on January 28, 1998. However, they remained with the parents. The children were physically removed for the first time on June 18, 1999, upon allegations that Raymond Jr. had molested his niece.[8] The children were returned within a few days on the condition that Raymond Jr. not reside in the home. However, the children again were removed, on July 22, 1999, after Maryann was hospitalized for a psychiatric evaluation. They have remained in foster care since that time.

The children have been involved with DCYF, in some form, since 1996. Because of their behavioral problems, Raymond III and Timothy were seen by Children's Intensive Services of Mental Health Services of Johnston (CIS). However, both parents either were unable or unwilling to become involved in their children's treatment at CIS. Additionally, Maryann was offered, and refused, parenting assistance from St. Mary's Home for Children (St.Mary's). After the children were committed to DCYF care and custody in January 1998, but while they remained at home, Spurwink R.I. Community Support Program (Spurwink) provided services to the family. These services were terminated after Maryann threatened Spurwink staff. Throughout this time the home was in deplorable condition: it was filled with garbage and reeked of animals and animal waste. Vermin had been seen on the beds, and the stench caused one caseworker to vomit. Moreover, on at least one occasion, Tiffany had been sent to bed without bathing, although covered in dirt.

In addition to the parent-aide services offered the parents, several case plans had been developed and agreed to by Maryann; however, none had been completed. After the children were removed for the second and last time, yet another case plan was developed. Maryann's mental health and emotional stability was of paramount concern if there was to be a return of the children. To that end, Maryann received counseling through Cranston–Johnston Mental Health Services (CJMHS). Unfor-

(12) months, and the parents were offered or received services to correct the situation which led to the child being placed; provided, that there is not a substantial probability that the child will be able to return safely to the parents' care within a reasonable period of time considering the child's age and the need for a permanent home."

4. Raymond III was born April 16, 1989.

5. Timothy was born June 27, 1990.

6. April was born April 3, 1992.

7. Tiffany was born May 25, 1994.

8. These charges were eventually dropped.

tunately, in August 1999, she was diagnosed with recurrent major depression with a history of psychosis. Although there were periods of improvement, she remained anxious and unstable, with brief periods of hospitalization.

In 1999, Maryann again agreed to provide the children with mental health services through CIS. Although, as noted, both Raymond III and Timothy had been seen by CIS in 1997, Raymond III was now diagnosed with oppositional defiant disorder as well as post traumatic stress disorder, and Timothy was diagnosed with adjustment disorder and possible post traumatic stress disorder.

In July 1999, a CIS clinician wrote to DCYF, expressing his opinion that the children were not safe in the home. After they were removed, all four children were psychologically evaluated. Tiffany was found to suffer from post traumatic stress disorder and presented with symptoms of sexual abuse. April talked about her father's physical abuse of her cousin and indicated that she had secrets—secrets she was told by her parents not to disclose. Raymond III had poor social skills and episodes of head banging. Timothy suffered from physical abuse, neglect, and behavior that was characterized as "acting out."

Appropriate housing was also an issue; although Maryann had moved into the Safe Haven residential facility in March 2000, by August she was discharged involuntarily for not following the rules. Furthermore, in November 2000, Providence Family Learning Center (PFLC) terminated Maryann's involvement in the parent education classes, pending further progress with her mental health problems. Even though considered stable as of March 2000, Maryann had not yet complied with a single case development plan or completed a parent education course.

Raymond Jr. was also noncompliant; he failed to complete a parent education course and refused to comply with case development plans. In addition, he made no effort to contact DCYF concerning his children's welfare or plan for the reunification of his family. The record discloses that Raymond Jr. was not involved in his children's treatment and made no effort to clean the home or care for the children. It is undisputed that these glaring parental deficiencies affected the health and welfare of these children.

In a long written decision, the trial justice found that Raymond Jr. failed to avail himself of services designed to reunite him with his family and failed to plan for his children's future or address his own issues. The trial justice found the father absent and not a participant in any meaningful reunification plan.

The trial justice observed, and Maryann's caseworker candidly acknowledged, that few services other than mental health counseling were offered in furtherance of reunification. Although this was an unfortunate lapse by DCYF, the trial justice also found that Maryann's mental illness prevented her from safely and effectively parenting her children and that this condition did not change even as late as April 2001. The trial court concluded that DCYF "has shown by clear and convincing evidence that [this] family has had a long history of DCYF involvement" and that "despite * * * intensive in-home services, both [parents] were either unwilling or unable to gain any insight or assimilate parenting skills." The trial justice also noted that Maryann continued to experience periods of instability, notwithstanding the mental health services she was receiving, and that she "continues to suffer from mental health issues which negatively impact her ability to parent her children safely and effectively."

The trial justice reviewed this case in light of the totality of the circumstances, including the lack of cooperation by both parents, the chronic problems with Maryann's mental illness, and Raymond Jr.'s refusal to engage in the services offered to him, compounded by the difficult parenting challenges presented by the children. He concluded that "it is doubtful that the children would ever be able to be safely returned to their home" and certainly not "within a reasonable period of time, considering their ages and need for a permanent home." He found that DCYF established this showing by clear and convincing evidence.

■ On appeal, both parents contend that DCYF failed to provide them with necessary services that could have led to reunification of the family. In addition, Raymond Jr. argues that DCYF failed to make reasonable efforts to encourage and strengthen the parental relationship, as evidenced by its failure to consult and cooperate with him in developing appropriate case plans and services for both himself and his children and by failing to provide suitable visitation arrangements.

This Court is satisfied that DCYF did not do all that it might have done in attempting to assist these parents in reunifying their family. However, although DCYF could have done more to assist this family, the agency's deficiencies are neither fatal nor determinative of this case. The record is replete with evidence that Maryann's mental illness was the primary barrier to reunification. The fact that DCYF sought to terminate her parental rights before Maryann completed a parenting class was unfortunate but not the critical issue before the court. Throughout this long, sad chapter, Maryann's mental illness remained the primary obstacle to reunification, and that was never overcome. Consequently, additional efforts and more services would have been futile in the face of her chronic mental illness.

For his part, Raymond Jr.'s arguments that DCYF failed to provide him with the necessary services or to inform him of his children's welfare are without merit. Raymond Jr. neither made himself available for services nor contacted DCYF concerning his children's welfare. The record discloses that Raymond Jr. was absent from this entire process and has forfeited his parental rights. Consequently, we deny his appeal.

■ A decree terminating parental rights, pursuant to § 15–7–7(a)(3), must be supported by evidence that the children have been in the care of DCYF for at least twelve months, the parents were offered services or received services geared toward correcting the problems that led to the placement, and there is not a substantial probability of the child's safe return within a reasonable time, "considering the child's age and the need for a permanent home." The agency involved must "make reasonable efforts to strengthen the parental relationship" before a petition for termination is filed. Section 15–7–7(b)(2). Upon a finding of unfitness, the best interests of the child become paramount, *In re Kristina L.*, 520 A.2d 574, 580 (R.I.1987), and primary consideration is to be given "to the physical, psychological, mental, and intellectual needs of the child." Section 15–7–7(c)(1).

■ The facts and circumstances surrounding a particular case determine whether the agency's efforts toward reunification are reasonable. *In re Kristen B.*, 558 A.2d 200, 203 (R.I.1989). When considering whether DCYF's actions are reasonable, this Court looks to the "totality of the circumstances." *In re William, Susan, and Joseph*, 448 A.2d 1250, 1255 (R.I. 1982). Parental conduct is a relevant fac-

tor. *In re Antonio G.*, 657 A.2d 1052, 1058 (R.I.1995). The parents must not only maintain contact with the child and plan for the child's future return but also "perform some minimal act toward the fulfillment of that plan." *In re Kristen B.*, 558 A.2d at 204. The state does not guarantee success and will not be burdened with "holding the hand of a recalcitrant parent." *Id.*

■ We long have recognized that children have a right "to reasonable care and maintenance, freedom from abuse or neglect, and * * * an opportunity to spend the remainder of [their] childhood in a family setting in which [they] may grow and thrive." *In re Stephanie*, 456 A.2d 268, 271 (R.I.1983) (quoting *In re David*, 427 A.2d 795, 801 (R.I.1981)). Moreover, children who are placed in state custody should not be made to wait indefinitely to find out whether their parents will successfully engage in treatment or comply with their rehabilitation responsibilities. *In re Eric K.*, 756 A.2d at 772–73.

The evidence adduced at trial established that the parents had been offered services beginning in 1997 and continuing through 1998, which were rejected. The record also discloses that Maryann's mental illness always was the primary barrier to reunification. Although the services offered to Maryann were not provided by DCYF, she did receive services that were related to her mental illness through CJMHS and these efforts were numerous and comprehensive. The statute does not require that DCYF be the sole provider of services to the parents. Section 15–7–7(a)(3). Services can be provided elsewhere, as long as these services are intended to correct the situation that led to the placement. *See In re William, Susan, and Joseph*, 448 A.2d at 1256 (reasonable for DCYF to make outside referrals for services unavailable through the department).

Unquestionably, Maryann's mental instability contributed to her inability to parent effectively, and mental health care was an appropriate, if not mandatory, protocol. *See In re Antonio G.*, 657 A.2d at 1058 (primary barrier to reunification needs to be addressed). Until Maryann's mental health improved to the point where she was stable, other services would have been futile. As late as November 2000, Maryann still was unable to benefit from parental education classes offered by the PFLC, which terminated its involvement until Maryann's mental illness was stabilized. DCYF's reluctance to provide parental education courses earlier, before Maryann had stabilized, therefore was reasonable under the circumstances.

These children have special challenges that must be addressed, and they are entitled to a stable home environment where they can grow, free from abuse and neglect. The parents have not demonstrated that they currently are capable of caring for the children or that they will be able to do so in the foreseeable future. *See In re Eric K.*, 756 A.2d at 772 (drug addicted mother's parental rights to the elder three of her six children terminated because it was unlikely the children could be returned within a reasonable timeframe). Maryann's mental illness is not sufficiently controlled, and Raymond Jr. has consistently shown he is not inclined to do what is necessary for the return of his children. *See In re Stephanie*, 456 A.2d at 270 (child's return not warranted because mother had not changed behavior that led to child's placement). These children need a stable and safe environment where all their needs can be met.

■ Finally, Maryann asserts that it was error to admit records from the Sexual Abuse and Trauma Center of Rhode

Island (SATCRI) and St. Mary's under Rule 803(6) of the Rhode Island Rules of Evidence, *Records of Regularly Conducted Activity,* or, colloquially, the business records exception. We reject this contention. There is no suggestion that the records from either SATCRI or St. Mary's were made in anticipation of litigation. The fact that the children were in DCYF custody at the time the records were compiled does not alter this result. The statements contained in the records were made in the ordinary course of business for purposes of medical treatment by those entities' agents and, as such, were admissible under the business records exception. *See* Rule 803(6).

Accordingly, the respondents' appeal is denied and dismissed. The decree of the Family Court is affirmed and the papers in this case are remanded to the Family Court.

Justice SUTTELL did not participate.