June 2, 2023

In re R.M.                              :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

In re R.M.                              :

Present: Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

## O P I N I O N

**Chief Justice Suttell, for the Court.**  The respondent father, Luis M., appeals from a Family Court decree terminating his parental rights to his daughter, R.M., born on March 25, 2018, pursuant to G.L. 1956 § 15-7-7(a)(2)(i) and (a)(3).  The decree also terminated the parental rights of the child's mother, Esmeralda M.[1]  She has a separate appeal from the decree pending before this Court.

This appeal came before the Supreme Court pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided.  After considering the parties' written and oral submissions and reviewing the record, we conclude that cause has not been shown and that this appeal may be decided without further briefing or argument.  For the reasons set forth in this opinion, we affirm the decree of the Family Court.

---

[1] To protect the identity of any children, in this opinion, we will use the children's initials and the biological parents' first names and last initials only. No disrespect is intended.

# I

## Facts and Travel

When R.M. was born in 2018, respondent and Esmeralda were already involved with the Department of Children, Youth, and Families. Esmeralda had four other children who were the subjects of existing petitions for termination of parental rights. *See In re Manuel P.*, 252 A.3d 1211 (R.I. 2021). The respondent is the father of one of those children, V.M.[2] When DCYF was notified that Esmeralda was seen with an infant on May 11, 2018, it filed an *ex parte* neglect petition and was granted temporary custody of R.M. DCYF developed two case plans for respondent with a goal of reunification. On February 5, 2019, however, respondent was arrested for substance-related crimes and was incarcerated until February 17, 2021. During some of that time period, Esmeralda was committed to Eleanor Slater Hospital for mental health issues.

On June 10, 2019, DCYF filed a petition to terminate the parental rights (the TPR petition) of respondent and Esmeralda pursuant to G.L. 1956 § 15-7-7(a)(2)(i) and (a)(3). The TPR petition against respondent was based on his incarceration and the child's placement in the care of DCYF for more than twelve months. DCYF alleged that there was not a substantial probability that the child could be returned

---

[2] The respondent consented to an open adoption for V.M. on September 11, 2018. *In re Manuel P.*, 252 A.3d 1211, 1214 n.5 (R.I. 2021).

to respondent's care within a reasonable period of time. Thereafter, on July 9, 2019, the Family Court suspended visitation of both respondent and Esmeralda.

A trial on the TPR petition was held on April 5, 6, and 7, 2021.[3] DCYF presented testimony from Kimberly Marino, a social caseworker for DCYF; Esmeralda; Jonny Lubo, a child protective investigator; Amanda Grandchamp, a clinician for the Families Together program; and Jane Ahles, a casework supervisor for DCYF. The respondent was called as a witness by DCYF, and he also testified on his own behalf. In addition, the trial justice considered the two case plans prepared for respondent, the Family Court Order regarding suspension of visitation, judgments of conviction against respondent, a protective order granted in favor of respondent against Esmeralda, and an affidavit supporting respondent's request for the protective order. We summarize the pertinent testimony of the various witnesses as follows.

### Kimberly Marino

DCYF first presented testimony from Kimberly Marino, a social caseworker for DCYF. She stated that she first became involved with Esmeralda and her children around April 2015. Marino testified that she was alerted that Esmeralda was seen with an infant on May 11, 2018. Because a TPR petition had already been

---

[3] In his written decision, the trial justice noted that this case was merged with the original neglect petition.

filed concerning Esmeralda's four other children, Marino indicated that a neglect petition was filed immediately, and R.M. was placed into DCYF custody.

Marino testified that she immediately began to develop a case plan for R.M. as it related to Esmeralda and respondent. Marino identified case plans for respondent dated June 14, 2018, and December 26, 2018. Marino stated that her case-planning concerns for respondent included his "history of criminal, violent behavior, substance use, and parenting." She indicated that the objectives for the case plans relating to R.M. were developed from respondent's case plan for V.M. She stated that she went over the June case plan with respondent and provided him with a copy. She testified that he never signed that plan because "he wanted to go over it with his attorney first." She could not recall meeting with respondent to go over the second case plan, but she testified that the concerns remained the same.

The respondent's case plans state that, based on his self-report and statements made regarding selling drugs in September 2018, "[respondent] will accept services to address documented history of substance use and will live a life free of drugs, alcohol and other illegal substances." The plans also required respondent to engage in substance-abuse evaluation openly and honestly and engage in toxicology screens at Family Court or with an outside provider.

Regarding substance abuse, Marino testified that previous documentation from the Adult Correctional Institutions "had very specific recommendations" about

respondent's substance abuse. Further, Marino claimed that respondent, respondent's mother, and Esmeralda had also indicated that he abused substances. Despite this, according to Marino, respondent stated that "he was clean" at the time.

Marino provided conflicting testimony regarding referrals and court orders to address respondent's suspected substance abuse. On direct examination, Marino testified that there was an order for respondent to obtain random substance-abuse screens. However, in response to the court's inquiry, Marino testified that no orders or referrals to substance-abuse screenings ever occurred with respect to R.M.'s case. Instead, she indicated that DCYF was monitoring prior referrals for respondent and Esmeralda.

Marino testified that respondent never provided any documentation of substance-abuse treatment. She stated that respondent did provide a drug screen to Roger Williams Hospital, but that DCYF never received the results. She recalled a letter sent from a clinician at Roger Williams Hospital on July 3, 2018, that stated respondent did not qualify for an evaluation for substance use.

To address parenting issues, Marino testified that respondent and Esmeralda were referred to supervised visitations with the Families Together program. Initially, she said, respondent and Esmeralda were referred together, but eventually, respondent was re-referred individually. Marino stated that she was present for the first visitation with respondent and Esmeralda. She recalled that respondent did a

good job taking the baby when Esmeralda needed a break. She was not present for other visitations, but she testified that the Families Together program had informed her that respondent was not "parenting properly."

Marino also testified about other interactions she had with Esmeralda and respondent. Marino testified that DCYF was primarily "concerned" about Esmeralda's "mental health." In particular, she testified regarding Esmeralda's mercurial conduct at the DCYF office. She also recalled Esmeralda missing visitations because of hospitalizations and criminal charges. According to Marino, because of Esmeralda's ongoing mental health issues and "erratic behavior," DCYF pressed respondent to obtain a protective order against her. As for respondent, Marino acknowledged that respondent's visitations were "consistent." Marino confirmed that respondent had made positive progress with overcoming parenting barriers. Still, Marino denied that respondent ever successfully completed the case plan goals.

Marino indicated that she learned that respondent had been arrested in February 2019. She also stated that she had no contact with respondent from January 2019 until June 2019, when the petition to terminate respondent's parental rights was filed. Marino testified that she filed a motion to suspend visitations in April 2019, which was granted on July 9, 2019.

Marino testified about R.M.'s placement as well. When R.M. was first removed from the parents' custody, she was placed in a foster home with her siblings. Marino stated that she visited the foster home and observed R.M. with her foster family at least once a month until 2019, when Marino was taken off the case. She observed that, at the time, R.M. was bonded to the home and that she "fit right in" with her siblings. At trial, she also indicated that R.M.'s foster home is a pre-adoptive home.

**Esmeralda**

DCYF also presented testimony from Esmeralda. Esmeralda testified that she gave birth to R.M. on March 25, 2018, in the Dominican Republic. She admitted that she did not inform DCYF that she was pregnant or that she gave birth. Esmeralda also conceded that she kept the pregnancy a secret because she "didn't want [DCYF] removing [her] child." Esmeralda further testified that respondent was present for all the visitations she attended until October 2018, when respondent filed a restraining order against her. She denied arguing with respondent during their visitations with R.M.

**Respondent**

The respondent testified extensively, first in DCYF's case-in-chief and then on his own behalf. He testified that he was present on March 25, 2018, when R.M.

was born in the Dominican Republic. He confirmed that he and Esmeralda traveled to the Dominican Republic to circumvent DCYF.

Regarding the case plans, respondent acknowledged receiving a copy of the first case plan. The respondent maintained that he tried to cooperate with DCYF's services and recommendations. He denied that DCYF ever asked him to do random drug screenings. Nevertheless, he testified that he attempted to obtain screenings from two different providers. The respondent claimed that he attempted to obtain a screening from CODAC Behavioral Healthcare, assuming it was affiliated with DCYF, but CODAC personnel told him that they could not perform the screening because he was not a client. After notifying Ahles and Marino, respondent said that he went to Roger Williams Hospital for an assessment on his own accord. He testified that Roger Williams Hospital deemed it unnecessary to continue treatment and that the hospital sent a letter to DCYF relaying the same. The respondent stated that he tried to communicate with DCYF after visiting Roger Williams Hospital, but that he never heard anything back. He stated that he left voicemails for both Ahles and Marino. He also testified that, around the same time, he had provided a sample to Job Corps for a new job he was starting; however, he stated that Job Corps does not keep such records.

The respondent maintained that he does not have a drug problem. He testified that he had only smoked marijuana a few times when he was seventeen and that "it

- 8 -

wasn't for [him]." He also denied having any mental health problems. Contrary to his case plan and testimony from Grandchamp, he denied ever telling Grandchamp that he sold drugs.

The respondent also testified that he engaged with the Families Together program and recalled the staff praising his work. He testified that he attended approximately six meetings with the Families Together program and that he was on time for those meetings. He also stated that, when he held R.M. during the visitations, she behaved as a normal six- to eight-month-old would. He said that during the visitations he was either holding R.M., watching her play, or otherwise engaging with her. He testified that R.M. appeared happy and that he was able to soothe her with a teething device when she was fussy. He also described Grandchamp's demeanor as "positive" after she observed him change R.M.'s diaper. The respondent also testified that he expressed to Grandchamp that he "would love to learn as much as [he] can to be the best father [he] could be" and to develop more patience.

The respondent testified that, at the time of the visitations, he and Esmeralda had not been in a relationship for "[a]bout a year." He also indicated that during one of the visitations, he became frustrated with Esmeralda trying to provoke him. He testified that DCYF told him that it was in his and R.M.'s best interests for him to obtain a restraining order against Esmeralda. The respondent also stated that there

were additional issues with Esmeralda that prompted him to request a restraining order. After the restraining order was entered, respondent testified, he did not have contact with Esmeralda.

The respondent acknowledged that he was arrested for possession and distribution of a controlled substance on or about February 5, 2019, and that it was "pretty close" to a visitation with R.M. He confirmed that he ultimately pled guilty to possession of and conspiracy to distribute heroin and to violating the terms of his probation stemming from a prior conviction for second-degree robbery.

The respondent claimed to have continued his efforts to reunify once he was incarcerated. He said that he attempted to participate in a parenting program while he was incarcerated but he was not able to obtain visitations. The respondent also stated that he attended the Providence Center's four-month substance-abuse program, but he did not present any documentation to support this testimony. The respondent asserted that, in late 2019 and early 2020, he took five parenting classes at the ACI before the classes were canceled due to the COVID-19 pandemic. The record, however, does not contain any documentation to support this claim.

The respondent also denied ever telling DCYF that he did not want R.M. to be brought to the ACI for visitations. He maintained that there should have been no issue with V.M. or R.M. visiting at the ACI. In terms of contracting or spreading

disease, he stated that the facilities were kept very clean and that his daughters would have been at no greater risk than they would have been at a daycare or DCYF.

At the time of trial, respondent testified that he had a full-time job with Cardi's Furniture, where he earned between $700 and $800 per week. He also testified that, at the time, he was living in a four-bedroom home with his mother and grandmother. The respondent also testified about his probation terms, which required him to provide "[c]lean urine," maintain employment, and maintain lawful behavior. He further testified that he does not spend time in "bad company" anymore, hoped that he can be a productive member of society, and "God willing, be able to raise [his] daughter."

### Amanda Grandchamp

DCYF also presented testimony from Amanda Grandchamp, a family clinician with the Families Together program. Grandchamp testified that, from August to October 2018, respondent and Esmeralda were referred to the Families Together program for visitation, as provided in the case plan, "to gain knowledge of different levels of child development, appropriate discipline, and boundary setting." Grandchamp also testified that, for "safety concerns," the first few visitations were held at the Providence DCYF office.

She stated that an initial intake with respondent and Esmeralda took place on August 14, 2018. Grandchamp testified that, when she inquired of the parents'

respective goals for the Families Together program, respondent said that he wanted to work on patience. When asked about their relationship, respondent told Grandchamp that he and Esmeralda had been in a relationship for six years, but at that point, had been separated for a few months. Grandchamp also testified that Esmeralda said that respondent's family sold drugs. According to Grandchamp, respondent replied to this by saying, "[w]e all sell drugs."

Grandchamp testified that, after the initial intake, she supervised six visitations with R.M. between August and October 2018. She stated that respondent attended two visitations by himself in September and October 2018. Grandchamp testified that Esmeralda had missed these two appointments because she was "psychiatrically hospitalized." During these visitations, Grandchamp confirmed that respondent appeared to be sober, although, she felt, it was not clear whether respondent was "of sound mind," and so she recommended a psychological evaluation.

According to Grandchamp, Esmeralda's behavior was erratic and provocative during the visitations. Except when Esmeralda was attempting to provoke respondent, Grandchamp testified, there was minimal communication between the two. Grandchamp stated that respondent was frequently frustrated with Esmeralda and expressed that he thought it was a waste of time to meet with her. Both parents, according to Grandchamp, would blame each other for their situation. In particular,

respondent blamed Esmeralda's involvement with the other children that opened R.M.'s case to DCYF.

Grandchamp testified that Esmeralda's behavior was "never consistent" and that "[h]er mood changed frequently." Grandchamp also recalled several instances where Esmeralda behaved inappropriately with R.M. Because of her observations, Grandchamp testified, she had concerns about respondent's ability to protect the baby. In particular, she testified that, when Esmeralda's behavior appeared unstable, she would sometimes "just take the baby from [respondent, and] he didn't object."

Grandchamp also testified that she was concerned with respondent's ability to parent. She noted that respondent struggled to change R.M.'s diaper and clean the child properly. She also expressed concern about respondent's knowledge of the baby's developmental stages because he would bring toys that were designed for older children and hold the baby incorrectly. Further, Grandchamp testified that she did not observe any bonding between respondent and the child.

Grandchamp testified that she could not recall discussing substance-abuse screenings or evaluations with respondent. In Grandchamp's final evaluation with respondent, she recommended that he engage in another parenting program without Esmeralda.

## Jane Ahles

DCYF also called Jane Ahles, the casework supervisor DCYF assigned to R.M.'s case. Ahles testified that she became involved with Esmeralda's children for a period in 2014 and then again in August 2015 until October 2019. She became involved in R.M.'s case on May 11, 2018, when R.M. was placed into DCYF custody. Like Marino and Grandchamp, Ahles also testified about Esmeralda's erratic and inappropriate behavior at visitations.

Ahles testified that on September 5, 2018, respondent approached her and discussed obtaining a restraining order against Esmeralda. She stated that he vaguely referenced his relationship with Esmeralda and indicated that things were not going well. She denied that DCYF had encouraged him to get the restraining order.

Ahles verified that she spoke with respondent about his case plan and his needs for services related to substance abuse and random screens on a number of occasions. She testified that respondent produced a letter from Roger Williams Hospital stating that, because he had self-reported as not having a problem with substances and tested negative, they did not feel that he needed a substance-abuse evaluation. Ahles also indicated that she continued to recommend that respondent be referred for both mental health and substance-abuse counseling. She stated that when she encouraged respondent to comply with the case plan, he denied having a

substance-abuse problem, claimed that he did not need counseling, and consistently blamed Esmeralda for the problems. She stated that he would sign releases but would not follow through with any type of referrals "because he said he didn't need them." She could not recall any formal referrals for mental health counseling. Ahles stated that DCYF provided respondent with "a referral for substance abuse" and "a couple of choices" of providers and that respondent ultimately "chose Roger Williams."

Ahles testified that respondent was eventually referred to an individual visitation program. According to her testimony, Ahles later learned that, after an individual visitation on February 4, 2019, respondent was arrested, along with family members, for charges related to substance distribution and possession. Ahles was additionally informed about respondent's incarceration at the ACI in connection with the arrest.

Ahles testified that DCYF is required to continue to attempt to provide visitation when an individual is incarcerated. She indicated that she did not discuss the prospect of respondent continuing to have visits with R.M. once respondent was incarcerated. She did, however, indicate that she had a discussion with respondent at an unspecified hearing. She stated that she offered to arrange visitation but "he declined * * * and said he would be getting out soon and he would prefer to visit [R.M.] with DCYF in the community, rather than have her come to the ACI." She

testified that, after respondent had not been released for several months, DCYF filed a motion to suspend visitations, which was subsequently granted in July 2019.

## The Family Court Decision

On October 14, 2021, the trial justice issued a decision.[4] The trial justice determined that DCYF had met its burden of proof for the TPR petition by presenting "clear and compelling evidence." He found by clear and convincing evidence that R.M. "remained in foster care for more than twelve months; that the parent was offered or received services to correct the situation which led to the child being placed; and that there is not a substantial probability that the child will be able to return safely to the parents' care within a reasonable period of time, considering the child's age and need for a permanent home." He further found that "both parents are unfit by reason of conduct and conditions seriously detrimental to the child, such as institutionalization of the parents, including imprisonment of such duration to render it improbable for the parents to care for the child for any extended period of time." In particular, he found that respondent's "suspected substance abuse,

---

[4] The trial justice issued an amended decision on November 23, 2021, where he corrected the spelling of names. There were no substantive changes.

- 16 -

domestic violence, criminal behavior and subsequent incarceration" prevented reunification with R.M.

The trial justice found that respondent was unfit because of his "actions and inactions." In particular, the trial justice found that respondent did not make efforts to take the steps needed to reunify with his daughter. This determination was based on the trial justice's finding that respondent "spurned" DCYF's referrals to substance-abuse and batterers' intervention programs. The trial justice also focused on the fact that respondent's criminal behavior led to his incarceration and loss of contact with R.M. He found that, based on the child's age and her need for a permanent home, there was no likelihood of change in a reasonable time. He also found that there was no parental bond between respondent and R.M. The trial justice found, therefore, by clear and convincing evidence that respondent was an unfit parent.

Next, the trial justice addressed whether DCYF made reasonable efforts to reunify respondent and the child. He reiterated that the major impediments to reunification were respondent's "criminal behavior, domestic violence, * * * suspected substance abuse, and his lack of protective capacity." The trial justice found that DCYF made referrals for a supervised visitation and parenting program for respondent. The trial justice also noted that respondent was referred to a second visitation program, but shortly thereafter he was arrested and incarcerated for the

- 17 -

next two years. The trial justice highlighted the fact that respondent failed to accept responsibility for R.M. being placed into DCYF custody and consistently blamed the mother. He also noted that respondent never obtained random toxicology screens. While the trial justice acknowledged respondent's progress with the Families Together program, he also recognized that it was respondent's arrest and incarceration that led to the suspension of visitations with R.M. The trial justice also discussed respondent's failure to submit documentation to the court concerning his participation in a parenting program while he was incarcerated.

Finally, based on R.M.'s placement with loving foster parents who intend to adopt her as well as her bond with her foster parents, sister, and half-brother, the trial justice ultimately found that termination of respondent's parental rights was in the best interests of the child.

A decree terminating respondent's parental rights to R.M. was entered on November 24, 2021. The respondent filed a timely notice of appeal.[5]

---

[5] The respondent originally appeared *pro se*, but then moved to have counsel appointed on May 5, 2022, and the public defender entered an appearance on May 17, 2022. On June 10, 2022, respondent filed an emergency motion to remand this case so that he could move to reinstate visitations. This Court denied the motion on June 17, 2022.

## II

## Standard of Review

"Natural parents have a fundamental liberty interest in the care, custody, and management of their children." *In re Jae'La G.*, 276 A.3d 378, 389 (R.I. 2022) (quoting *In re Manuel P.*, 252 A.3d at 1218). "That interest 'does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the state.'" *Id.* (brackets omitted) (quoting *In re Manuel P.*, 252 A.3d at 1218). "The fundamental right of parents, however, is 'not absolute.'" *Id.* (brackets omitted) (quoting *In re Manuel P.*, 252 A.3d at 1218). Before terminating a parent's rights, the Family Court must find that the parent is unfit. *Id.* "Given the drastic and irreversible nature of a termination of parental rights decree, 'the right to due process requires that the state support its allegations by clear and convincing evidence.'" *In re Rylee A.*, 233 A.3d 1040, 1051 (R.I. 2020) (quoting *In re Violet G.*, 212 A.3d 160, 166 (R.I. 2019)).

"On appeal, this Court reviews termination of parental rights rulings by examining the record to establish whether the Family Court justice's findings are supported by legal and competent evidence." *In re Violet G.*, 212 A.3d at 166 (quoting *In re Amiah P.*, 54 A.3d 446, 451 (R.I. 2012)). Those findings "are entitled to great weight, and this Court will not disturb them unless they are clearly wrong

or the trial justice overlooked or misconceived material evidence." *Id*. (quoting *In re Amiah P*., 54 A.3d at 451).

## III

## Discussion

On appeal, respondent argues that the trial justice erred in finding that (1) he is unfit to parent R.M.; (2) DCYF's efforts at reunification were reasonable; and (3) termination of respondent's parental rights is in R.M.'s best interests. We address each of these arguments in turn.

## Parental Fitness

The respondent first argues that the trial justice erred in finding he was unfit. In particular, respondent avers that he demonstrated that he had "made significant efforts to reunify with [R.M.], often without the assistance that DCYF was required to provide." The respondent emphasizes that DCYF referred him to only one service, the Families Together program, for supervised visitations with R.M. He also emphasizes Marino's and Grandchamp's testimonies regarding his positive progress and engagement with the program. Further, he claims that Marino's and Ahles's "waffling, speculative testimony" did not specify any referrals for other services.

The respondent also argues that the trial justice's finding that there was not a substantial probability of a safe return in a reasonable time was clearly wrong

because the trial justice misconceived and overlooked evidence. He claims that the trial justice overlooked his testimony that he attended classes while he was incarcerated. Furthermore, respondent underscores that he obtained a restraining order against Esmeralda, creating a safer and more stable environment for R.M. He also highlights that he was released from prison before the trial which, according to respondent, is a crucial fact that has been considered by this Court in other cases involving unfitness of an incarcerated parent. Thus, respondent argues that the trial justice's finding that he is unfit due to a refusal to engage with his case plan or incarceration is clearly wrong.

Before terminating a respondent's parental rights pursuant to § 15-7-7(a)(2)(i) and (a)(3), the trial justice must find by clear and convincing evidence that:

> "(2) The parent is unfit by reason of conduct or conditions seriously detrimental to the child; such as, but not limited to, the following:
>
> "(i) Institutionalization of the parent, including imprisonment, for a duration as to render it improbable for the parent to care for the child for an extended period of time;
>
> "* * *
>
> "(3) The child has been placed in the legal custody or care of [DCYF] for at least twelve (12) months, and the parents were offered or received services to correct the situation that led to the child being placed; provided, that there is not a substantial probability that the child will be able to return safely to the parents' care within a reasonable

- 21 -

period of time considering the child's age and the need for a permanent home[.]" Sections 15-7-7(a)(2)(i), (a)(3).

This Court has stated that "refusal to cooperate with the objectives of the case plans constitutes clear and convincing evidence of a lack of interest in the child and, as such, could properly serve as a basis for a finding of parental unfitness." *In re Elana W.*, 249 A.3d 287, 294 (R.I. 2021) (quoting *In re James H.*, 181 A.3d 19, 27 (R.I. 2018)).

In finding respondent unfit, the trial justice found by clear and convincing evidence that R.M. had been in the care of DCYF for a period in excess of twelve months—since May 2018. Moreover, R.M. had been in DCYF custody for eight months before respondent was incarcerated for substance-related offenses. The trial justice also found that, while DCYF offered services to respondent, he refused to meaningfully engage with DCYF and most of the services offered to him, particularly those related to mental health, suspected substance abuse, and criminal behavior. The trial justice found that respondent denied any issues that DCYF identified as barriers to reunification, and therefore he could not avail himself of the services needed to achieve his case plan objectives. The trial justice also explicitly stated that it was respondent's substance-related criminal behavior that led to his incarceration and his loss of contact with R.M. for most of her life.

Although respondent's progress with supervised visitations at the Families Together program is noted, we are also of the opinion that his steadfast refusal to

- 22 -

accept responsibility for his role in R.M.'s removal to DCYF custody supports the trial justice's finding that respondent is unfit and that there is "no likelihood of a successful reunification with [respondent] within a reasonable time * * *."

The circumstances of R.M.'s clandestine birth, respondent's complicity with Esmeralda to conceal R.M. from DCYF, respondent's criminal conduct and incarceration, and his lack of bonding with the child are indicative of conditions in respondent's life that are seriously detrimental to a child. Yet, respondent refused to acknowledge a need for services. *See In re Elana W.*, 249 A.3d at 294. At this time, R.M. is about five years old and has spent all but one and a half months in DCYF custody. Therefore, considering R.M.'s age and her need for a permanent home, our review of the record convinces us that legally competent evidence exists to support the trial justice's finding as to parental unfitness.

### Reasonable Efforts to Reunify

The respondent further argues that the trial justice erred in finding that DCYF made reasonable efforts to "encourage and strengthen the parental relationship." Section 15-7-7(b)(1). The respondent submits that DCYF most keenly failed to undertake reasonable efforts by failing to provide him with referrals to appropriate services. He claims that DCYF ignored his self-assessments and that the case plans required him to dishonestly report that he was suffering from substance abuse. Further, respondent argues that DCYF failed to communicate or make suitable

visitation arrangements with R.M. during his incarceration. He asserts that Ahles's testimony that respondent refused visitations at an unspecified hearing was not credible, especially in light of her statement that she did not discuss the prospect of continuing visitations after he was incarcerated.

Before terminating a respondent's parental rights in accordance with § 15-7-7(a)(3), DCYF must establish "by clear and convincing evidence that it offered services that amount to a reasonable effort to correct the situation that led to the children's removal from the parent's care." *In re Jae'La G.*, 276 A.3d at 391 (brackets omitted) (quoting *In re Gelvin B*., 251 A.3d 503, 510 (R.I. 2021)). DCYF need not "'demonstrate that it took extraordinary efforts'; rather, DCYF must 'employ reasonable efforts, and the reasonableness of such efforts must be determined from the particular facts and circumstances of each case.'" *Id*. (quoting *In re Gelvin B.*, 251 A.3d at 510). Whether DCYF's efforts were reasonable should be analyzed subjectively, "taking into account, among other things, the conduct and cooperation of the parents." *Id.* (quoting *In re Jose Luis R.H.*, 968 A.2d 875, 882 (R.I. 2009)); *In re Raymond C.*, 864 A.2d 629, 633-34 (R.I. 2005).

The trial justice found that "[t]he major impediments to reunification with [respondent] were his criminal behavior, domestic violence, his suspected substance abuse and his lack of protective capacity." To address these issues, the trial justice found, DCYF developed two case plans in June and December 2018. The trial

- 24 -

justice found that these case plans required respondent to "attend random toxicology screens at Family Court or another agency, if necessary; engage openly and honestly in a substance abuse evaluation and participate in batterers' intervention and anger management programs and mental health counseling." Despite the case plan goals and DCYF's attempts to engage respondent, the trial justice found that respondent "spurned their referrals" by refusing services and denying responsibility for DCYF involvement. Further, the trial justice found, even though respondent was referred to and participated in six visitations with the Families Together program and an additional visitation program, respondent was arrested and incarcerated for the next two years for substance-related charges.

At the outset, we note that, notwithstanding Marino's testimony that there was an order for respondent to obtain random substance-abuse screens, no such order existed in R.M.'s case. In fact, the case plans with respect to R.M's case did not specify random screens. Instead, the plans provided, following an open and honest evaluation, "father to engage in toxicology screens at Family Court or other agency if necessary."

Based upon our review of the record, however, we are satisfied that the findings of the trial justice are supported by legal and competent evidence and are thus entitled to great weight. We decline to disrupt them.

The evidence presented at trial demonstrates that DCYF referred respondent to a supervised visitation and parenting program. Although respondent arrived at these visitations on time and sober, staff observed his failure to interfere when Esmeralda's erratic behavior endangered R.M. Additionally, despite being on probation for second-degree robbery, the circumstances of respondent's arrest and subsequent conviction evince a continuation of his criminal behavior. Even so, respondent denied any responsibility and consistently asserted that Esmeralda was the sole impetus for DCYF's involvement with R.M. His minimal cooperation with DCYF is an indication of his inability to put R.M.'s interests before his own and his lack of protective capacity.

We have previously stated that the "state does not guarantee success and will not be burdened with 'holding the hand of a recalcitrant parent.'" *In re Raymond C.*, 864 A.2d at 634 (quoting *In re Kristen B.*, 558 A.2d 200, 204 (R.I. 1989)). Thus, taking into account that it was ultimately respondent's own criminal conduct that interrupted his visitations with R.M. and his refusal to meaningfully cooperate with DCYF, we decline to disrupt the trial justice's finding that DCYF's efforts were reasonable under the circumstances. *See In re Jae'La G.*, 276 A.3d at 391. "Such a finding is entitled to 'a substantial amount of deference due to the fact that the trial justice has had an opportunity to appraise witness demeanor and to take into account other realities that cannot be grasped from a reading of a cold record.'" *In re Gelvin*

- 26 -

*B.*, 251 A.3d at 510 (deletions omitted) (quoting *Tsonos v. Tsonos*, 222 A.3d 927, 934 (R.I. 2019)).

**Child's Best Interests**

Finally, respondent argues that the trial justice erred when he determined that it was in R.M.'s best interests for respondent's parental rights to be terminated. In particular, respondent claims that the trial justice overlooked several matters, including his progress with the Families Together program, his stable employment and living situation, his successful parole, and his love for and desire to raise R.M.

"Once DCYF has demonstrated parental unfitness and has shown that it made reasonable efforts at reunification, the analysis then shifts to the overarching issue of the best interests of the child, a determination that outweighs all others." *In re Violet G.*, 212 A.3d at 167. Severing the bond between the parent and child is a substantial disruption. *See In re Alexis L.*, 972 A.2d 159, 170 (R.I. 2009). But it is in "the best interests of children to have a safe and nurturing environment in which to live, learn and grow." *Id.*

The trial justice is permitted to consider relationships and bonds that have formed in a foster home. *See In re Alexis L.*, 972 A.2d at 170. The trial justice found that R.M. is happy and thriving in her pre-adoptive foster home. He further found that R.M. is bonded to her foster parents, as well as with her biological sister and half-brother. Additionally, R.M. is roughly five years old, and the respondent has

- 27 -

had no contact with her for over four years. As such, we are satisfied that the evidence presented in this case clearly supports the trial justice's determination that it is in R.M.'s best interests to terminate the respondent's parental rights so that she may be adopted by the foster parents who have raised her.

## IV

## Conclusion

For the reasons stated herein, we affirm the decree of the Family Court terminating the respondent's parental rights. The papers may be remanded to the Family Court.



# STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE
Licht Judicial Complex
250 Benefit Street
Providence, RI  02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | In re R.M. |
| **Case Number** | No. 2021-336-Appeal.<br>(P 19-3074) |
| **Date Opinion Filed** | June 2, 2023 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Chief Justice Paul A. Suttell |
| **Source of Appeal** | Providence County Family Court |
| **Judicial Officer from Lower Court** | Chief Judge Michael B. Forte |
| **Attorney(s) on Appeal** | For Petitioner:<br><br>Benjamin Copple<br>Department of Children, Youth and Families<br><br>Andrew J. Johnson<br>Court Appointed Special Advocate |
| | For Respondent:<br><br>Camille A. McKenna<br>Rhode Island Public Defender |